## FIREFIGHTERS LOCAL UNION NO. 1784 *v.* STOTTS ET AL.

No. 82–206.   Argued December 6, 1983—Decided June 12, 1984*

---

*Together with No. 82–229, *Memphis Fire Department et al.* v. *Stotts et al.*, also on certiorari to the same court.

562

*Allen S. Blair* argued the cause for petitioners in both cases. With him on the brief for petitioner in No. 82–206 was *James R. Newsom III. Clifford D. Pierce, Jr.,* and *Louis P. Britt III* filed a brief for petitioners in No. 82–229. Messrs. Blair, Newsom, Pierce, and Britt filed a reply brief for petitioners in both cases.

*Solicitor General Lee* argued the cause for the United States as *amicus curiae* in support of petitioners. With him on the brief were *Assistant Attorney General Reynolds, Dep-*

uty Assistant Attorney General Cooper, Carter G. Phillips, Brian K. Landsberg, and Dennis J. Dimsey.

Richard B. Fields argued the cause for respondents. With him on the brief were Thomas M. Daniel, Jack Greenberg, O. Peter Sherwood, Clyde E. Murphy, Ronald L. Ellis, Eric Schnapper, and Barry L. Goldstein.†

JUSTICE WHITE delivered the opinion of the Court.

Petitioners challenge the Court of Appeals' approval of an order enjoining the City of Memphis from following its seniority system in determining who must be laid off as a result of a budgetary shortfall. Respondents contend that the injunction was necessary to effectuate the terms of a Title VII consent decree in which the City agreed to undertake certain obligations in order to remedy past hiring and promotional

---

†Briefs of amici curiae urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations et al. by J. Albert Woll, Michael H. Gottesman, Robert M. Weinberg, and Laurence Gold; for the Anti-Defamation League of B'nai B'rith by Robert A. Helman, Michele Odorizzi, Daniel M. Harris, Justin J. Finger, Meyer Eisenberg, Jeffrey P. Sinensky, and Leslie Shedlin; for the Detroit Police Officers Association by Walter S. Nussbaum and Donald J. Mooney, Jr.; for the Equal Employment Advisory Council by Robert E. Williams, Douglas S. McDowell, and Thomas R. Bagby; for the International Association of Fire Fighters, AFL–CIO, by Edward J. Hickey, Jr., and Michael S. Wolly; and for the Washington Legal Foundation by Daniel J. Popeo, Paul D. Kamenar, and Nicholas E. Calio.

Briefs of amici curiae urging affirmance were filed for the City of Detroit by Frank Jackson; for the Affirmative Action Coordinating Center et al. by Morton Stavis, Jeanny Mirer, and Jules Lobel; for the American Jewish Congress by Nathan Z. Dershowitz; for the Lawyers' Committee for Civil Rights Under Law by Richard M. Sharp, Jeffrey C. Martin, Fred N. Fishman, Robert H. Kapp, and William L. Robinson; for the Mexican American Legal Defense and Educational Fund by Robert L. King, Joaquin G. Avila, and Morris J. Baller; for the National Black Police Association et al. by E. Richard Larson and Burt Neuborne; for the National Organization for Women et al. by Judith I. Avner; and for Officers for Justice et al. by Robert L. Harris and Eva Jefferson Paterson.

practices. Because we conclude that the order cannot be justified, either as an effort to enforce the consent decree or as a valid modification, we reverse.

I

In 1977 respondent Carl Stotts, a black holding the position of firefighting captain in the Memphis, Tenn., Fire Department, filed a class-action complaint in the United States District Court for the Western District of Tennessee. The complaint charged that the Memphis Fire Department and certain city officials were engaged in a pattern or practice of making hiring and promotion decisions on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, as well as 42 U. S. C. §§ 1981 and 1983. The District Court certified the case as a class action and consolidated it with an individual action subsequently filed by respondent Fred Jones, a black firefighting private in the Department, who claimed that he had been denied a promotion because of his race. Discovery proceeded, settlement negotiations ensued, and, in due course, a consent decree was approved and entered by the District Court on April 25, 1980.

The stated purpose of the decree was to remedy the hiring and promotion practices "of the . . . Department with respect to the employment of blacks." 679 F. 2d 541, 575–576 (CA6 1982) (Appendix). Accordingly, the City agreed to promote 13 named individuals and to provide backpay to 81 employees of the Fire Department. It also adopted the long-term goal of increasing the proportion of minority representation in each job classification in the Fire Department to approximately the proportion of blacks in the labor force in Shelby County, Tenn. However, the City did not, by agreeing to the decree, admit "any violations of law, rule, or regulation with respect to the allegations" in the complaint. *Id.*, at 574. The plaintiffs waived any further relief save to enforce the decree, *ibid.*, and the District Court retained jurisdiction "for

such further orders as may be necessary or appropriate to effectuate the purposes of this decree." *Id.*, at 578.

The long-term hiring goal outlined in the decree paralleled the provisions of a 1974 consent decree, which settled a case brought against the City by the United States and which applied citywide. Like the 1974 decree, the 1980 decree also established an interim hiring goal of filling on an annual basis 50 percent of the job vacancies in the Department with qualified black applicants. The 1980 decree contained an additional goal with respect to promotions: the Department was to attempt to ensure that 20 percent of the promotions in each job classification be given to blacks. Neither decree contained provisions for layoffs or reductions in rank, and neither awarded any competitive seniority. The 1974 decree did require that for purposes of promotion, transfer, and assignment, seniority was to be computed "as the total seniority of that person with the City." *Id.*, at 572.

In early May 1981, the City announced that projected budget deficits required a reduction of nonessential personnel throughout the city government. Layoffs were to be based on the "last hired, first fired" rule under which citywide seniority, determined by each employee's length of continuous service from the latest date of permanent employment, was the basis for deciding who would be laid off. If a senior employee's position were abolished or eliminated, the employee could "bump down" to a lower ranking position rather than be laid off. As the Court of Appeals later noted, this layoff policy was adopted pursuant to the seniority system "mentioned in the 1974 Decree and . . . incorporated in the City's memorandum of understanding with the Union." 679 F. 2d, at 549.

On May 4, at respondents' request, the District Court entered a temporary restraining order forbidding the layoff of any black employee. The Union, which previously had not been a party to either of these cases, was permitted to intervene. At the preliminary injunction hearing, it appeared

that 55 then-filled positions in the Department were to be eliminated and that 39 of these positions were filled with employees having "bumping" rights. It was estimated that 40 least-senior employees in the firefighting bureau of the Department[1] would be laid off and that of these 25 were white and 15 black. It also appeared that 56 percent of the employees hired in the Department since 1974 had been black and that the percentage of black employees had increased from approximately 3 or 4 percent in 1974 to 11½ percent in 1980.

On May 18, the District Court entered an order granting an injunction. The court found that the consent decree "did not contemplate the method to be used for reduction in rank or lay-off," and that the layoff policy was in accordance with the City's seniority system and was not adopted with any intent to discriminate. Nonetheless, concluding that the proposed layoffs would have a racially discriminatory effect and that the seniority system was not a bona fide one, the District Court ordered that the City "not apply the seniority policy proposed insofar as it will decrease the percentage of black lieutenants, drivers, inspectors and privates that are presently employed . . . ." On June 23, the District Court broadened its order to include three additional classifications. A modified layoff plan, aimed at protecting black employees in the seven classifications so as to comply with the court's order, was presented and approved. Layoffs pursuant to the modified plan were then carried out. In certain instances, to comply with the injunction, nonminority employees with more seniority than minority employees were laid off or demoted in rank.[2]

---

[1] The Memphis Fire Department is divided into several bureaus, including firefighting, alarm office, administration, apparatus, maintenance, and fire prevention. Of the positions covered by the original injunction, all but one were in the firefighting bureau.

[2] The City ultimately laid off 24 privates, 3 of whom were black. Had the seniority system been followed, 6 blacks would have been among the 24 privates laid off. Thus, three white employees were laid off as a

On appeal, the Court of Appeals for the Sixth Circuit affirmed despite its conclusion that the District Court was wrong in holding that the City's seniority system was not bona fide. 679 F. 2d, at 551, n. 6. Characterizing the principal isssue as "whether the district court erred in modifying the 1980 Decree to prevent minority employment from being affected disproportionately by unanticipated layoffs," *id.*, at 551, the Court of Appeals concluded that the District Court had acted properly. After determining that the decree was properly approved in the first instance, the court held that the modification was permissible under general contract principles because the City "contracted" to provide "a substantial increase in the number of minorities in supervisory positions" and the layoffs would breach that contract. *Id.*, at 561. Alternatively, the court held that the District Court was authorized to modify the decree because new and unforeseen circumstances had created a hardship for one of the parties to the decree. *Id.*, at 562–563. Finally, articulating three alternative rationales, the court rejected petitioners' argument that the modification was improper because it conflicted with the City's seniority system, which was immunized from Title VII attack under § 703(h) of that Act, 42 U. S. C. § 2000e–2(h).

The Fire Department (and city officials) and the Union filed separate petitions for certiorari. The two petitions were granted, 462 U. S. 1105 (1983), and the cases were consolidated for oral argument.

## II

We deal first with the claim that these cases are moot. Respondents submit that the injunction entered in these cases was a preliminary injunction dealing only with the 1981 layoffs, that all white employees laid off as a result of the injunction were restored to duty only one month after their lay-

---

direct result of the District Court's order. The number of whites demoted as a result of the order is not clear from the record before us.

off, and that those who were demoted have now been offered back their old positions. Assertedly, the injunction no longer has force or effect, and the cases are therefore moot. For several reasons, we find the submission untenable.

First, the injunction on its face ordered that "the defendants not apply the seniority policy proposed insofar as it will decrease the percentage of black" employees in specified classifications in the Department. The seniority policy was the policy adopted by the City and contained in the collective-bargaining contract with the Union. The injunction was affirmed by the Court of Appeals and has never been vacated. It would appear from its terms that the injunction is still in force and that unless set aside must be complied with in connection with any future layoffs.

Second, even if the injunction itself applied only to the 1981 layoffs, the predicate for the so-called preliminary injunction was the ruling that the consent decree must be construed to mean and, in any event, must be modified to provide that layoffs were not to reduce the percentage of blacks employed in the Fire Department. Furthermore, both the District Court and the Court of Appeals, for different reasons, held that the seniority provisions of the City's collective-bargaining contract must be disregarded for the purpose of achieving the mandated result. These rulings remain undisturbed, and we see no indication that respondents concede in urging mootness that these rulings were in error and should be reversed. To the contrary, they continue to defend them. Unless overturned, these rulings would require the City to obey the modified consent decree and to disregard its seniority agreement in making future layoffs.

Accordingly, the inquiry is not merely whether the injunction is still in effect, but whether the mandated modification of the consent decree continues to have an impact on the parties such that the case remains alive.[3] We are quite uncon-

---

[3] The Court of Appeals, recognizing that the District Court had done more than temporarily preclude the City from applying its seniority sys-

vinced—and it is the respondents' burden to convince us, *County of Los Angeles* v. *Davis*, 440 U. S. 625, 631 (1979)— that the modification of the decree and the *pro tanto* invalidation of the seniority system is of no real concern to the City because it will never again contemplate layoffs that if carried out in accordance with the seniority system would violate the modified decree.[4] For this reason alone, the case is not moot.

---

tem, stated that the "principal issue" before it was "whether the district court erred in modifying the 1980 Decree to prevent minority employment from being affected disproportionately by unanticipated layoffs." 679 F. 2d, at 551.

[4] Of course if layoffs become necessary, both the City and respondents will be affected by the modified decree, the City because it will be unable to apply its seniority system, respondents because they will be given greater protection than they would otherwise receive under that system. Moreover, the City will be immediately affected by the modification even though no layoff is currently pending. If the lower courts' ruling is left intact, the City will no longer be able to promise current or future employees that layoffs will be conducted solely on the basis of seniority. Against its will, the City has been deprived of the power to offer its employees one of the benefits that make employment with the City attractive to many workers. Seniority has traditionally been, and continues to be, a matter of great concern to American workers. " 'More than any other provision of the collective [-bargaining] agreement . . . seniority affects the economic security of the individual employee covered by its terms.'" *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 766 (1976) (quoting Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1535 (1962)). It is not idle speculation to suppose that the City will be required to offer greater monetary compensation or fringe benefits in order to attract and retain the same caliber and number of workers as it could without offering such benefits were it completely free to implement its seniority system. The extent to which the City's employment efforts will be harmed by the loss of this "bargaining chip" may be difficult to measure, but in view of the importance that American workers have traditionally placed on such benefits, the harm cannot be said to be insignificant. Certainly, an employer's bargaining position is as substantially affected by a decree precluding it from offering its employees the benefits of a seniority system as it is by a state statute that provides economic benefits to striking employees. *Super Tire Engineering Co.* v. *McCorkle*, 416 U. S. 115, 122–125 (1974).

Third, the judgment below will have a continuing effect on the City's management of the Department in still another way. Although the City has restored or offered to restore to their former positions all white employees who were laid off or demoted, those employees have not been made whole: those who were laid off have lost a month's pay, as well as seniority that has not been restored; and those employees who "bumped down" and accepted lesser positions will also have backpay claims if their demotions were unjustified. Unless the judgment of the Court of Appeals is reversed, however, the layoffs and demotions were in accordance with the law, and it would be quite unreasonable to expect the City to pay out money to which the employees had no legal right. Nor would it feel free to respond to the seniority claims of the three white employees who, as the City points out, lost competitive seniority in relation to all other individuals who were not laid off, including those minority employees who would have been laid off but for the injunction.[5] On the other hand, if the Court of Appeals' judgment is reversed, the City would be free to take a wholly different position with respect to backpay and seniority.

Undoubtedly, not much money and seniority are involved, but the amount of money and seniority at stake does not determine mootness. As long as the parties have a concrete interest in the outcome of the litigation, the case is not moot notwithstanding the size of the dispute. *Powell* v. *McCormack*, 395 U. S. 486, 496–498 (1969). Moreover, a month's pay is not a negligible item for those affected by the injunction, and the loss of a month's competitive seniority may later

---

[5] Since the District Court's order precludes the City from reducing the percentage of black employees holding particular jobs in the event of a layoff or reduction in rank and since competitive seniority is the basis for determining who will be laid off or bumped down, there is some question whether, in light of the judgment below, the City could legally restore to the laid-off employees the competitive seniority they had before the layoffs without violating the order.

determine who gets a promotion, who is entitled to bid for transfers, or who is first laid off if there is another reduction in force.  These are matters of substance, it seems to us, and enough so to foreclose any claim of mootness.  Cf. *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 756 (1976); *Powell* v. *McCormack, supra*, at 496–498; *Bond* v. *Floyd*, 385 U. S. 116, 128, n. 4 (1966).

In short, respondents successfully attacked the City's initial layoff plan and secured a judgment modifying the consent decree, ordering the City to disregard its seniority policy, and enjoining any layoffs that would reduce the percentage of blacks in the Department.  Respondents continue to defend those rulings, which, as we have said, may determine the City's disposition of backpay claims and claims for restoration of competitive seniority that will affect respondents themselves.  It is thus unrealistic to claim that there is no longer a dispute between the City and respondents with respect to the scope of the consent decree.  Respondents cannot invoke the jurisdiction of a federal court to obtain a favorable modification of a consent decree and then insulate that ruling from appellate review by claiming that they are no longer interested in the matter, particularly when the modification continues to have adverse effects on the other parties to the action.[6]

### III

The issue at the heart of this case is whether the District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable

---

[6] The present case is distinguishable from *University of Texas* v. *Camenisch*, 451 U. S. 390 (1981), on which the dissent relies, in that the defendant in *Camenisch* was not a party to a decree that had been modified by the lower court.  When the injunction in that case expired, the defendant was in all respects restored to its pre-injunction status.  Here, the City is faced with a modified consent decree that prevents it from applying its seniority system in the manner that it chooses.

seniority system[7] would have called for the layoff of black employees with less seniority.[8]   We are convinced that the Court of Appeals erred in resolving this issue and in affirming the District Court.

A

The Court of Appeals first held that the injunction did no more than enforce the terms of the consent decree.   This specific-performance approach rests on the notion that be-

---

[7] Respondents contend that the memorandum of understanding between the Union and the City is unenforceable under state law, citing *Fulenwider* v. *Firefighters Assn. Local Union 1784*, 649 S. W. 2d 268 (Tenn. 1982). However, the validity of that memorandum under state law is unimportant for purposes of the issues presented in this case.   First, the Court of Appeals assumed that the memorandum was valid in reaching its decision. 679 F. 2d, at 564, n. 20.   Since we are reviewing that decision, we are free to assume the same.   Moreover, even if the memorandum is unenforceable, the City's seniority system is still in place.   The City unilaterally adopted the seniority system citywide in 1973.   That policy was incorporated into the memorandum of understanding with the Firefighters Union in 1975, but its citywide effect, including its application to the Fire Department, continues irrespective of the status of the memorandum.

[8] The dissent's contention that the only issue before us is whether the District Court so misapplied the standards for issuing a preliminary injunction that it abused its discretion, *post*, at 601, overlooks what the District Court did in this case.   The District Court did not purport to apply the standards for determining whether to issue a preliminary injunction.   It did not even mention them.   Instead, having found that the consent decree did "not contemplate what method would be used for a reduction in rank or layoff," the court considered "whether or not . . . it should exercise its authority to modify the consent decree . . . ."   App. to Pet. for Cert. in No. 82–229, p. A73.   As noted above, the Court of Appeals correctly recognized that more was at stake than a mere preliminary injunction, stating that the "principal issue" was "whether the district court erred in modifying the 1980 Decree to prevent minority employment from being affected disproportionately by unanticipated layoffs."   679 F. 2d, at 551.   By deciding whether the District Court erred in interpreting or modifying the consent decree so as to preclude the City from applying its seniority system, we do not, as the dissent shrills, attempt to answer a question never faced by the lower courts.

cause the City was under a general obligation to use its best efforts to increase the proportion of blacks on the force, it breached the decree by attempting to effectuate a layoff policy reducing the percentage of black employees in the Department even though such a policy was mandated by the seniority system adopted by the City and the Union. A variation of this argument is that since the decree permitted the District Court to enter any later orders that "may be necessary or appropriate to effectuate the purposes of this decree," 679 F. 2d, at 578 (Appendix), the City had agreed in advance to an injunction against layoffs that would reduce the proportion of black employees. We are convinced, however, that both of these are improvident constructions of the consent decree.

It is to be recalled that the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it" or by what "might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States* v. *Armour & Co.*, 402 U. S. 673, 681–682 (1971). Here, as the District Court recognized, there is no mention of layoffs or demotions within the four corners of the decree; nor is there any suggestion of an intention to depart from the existing seniority system or from the City's arrangements with the Union. We cannot believe that the parties to the decree thought that the City would simply disregard its arrangements with the Union and the seniority system it was then following. Had there been any intention to depart from the seniority plan in the event of layoffs or demotions, it is much more reasonable to believe that there would have been an express provision to that effect. This is particularly true since the decree stated that it was not "intended to conflict with any provisions" of the 1974 decree, 679 F. 2d, at 574 (Appendix), and since the latter decree expressly anticipated that the City would recognize seniority, *id.*, at 572. It is thus not surprising that when the City anticipated layoffs and demotions, it in the first instance

faithfully followed its pre-existing seniority system, plainly having no thought that it had already agreed to depart from it. It therefore cannot be said that the express terms of the decree contemplated that such an injunction would be entered.

The argument that the injunction was proper because it carried out the purposes of the decree is equally unconvincing. The decree announced that its purpose was "to remedy past hiring and promotion practices" of the Department, *id.*, at 575–576, and to settle the dispute as to the "appropriate and valid procedures for hiring and promotion," *id.*, at 574. The decree went on to provide the agreed-upon remedy, but as we have indicated, that remedy did not include the displacement of white employees with seniority over blacks. Furthermore, it is reasonable to believe that the "remedy", which it was the purpose of the decree to provide, would not exceed the bounds of the remedies that are appropriate under Title VII, at least absent some express provision to that effect. As our cases have made clear, however, and as will be reemphasized below, Title VII protects bona fide seniority systems, and it is inappropriate to deny an innocent employee the benefits of his seniority in order to provide a remedy in a pattern-or-practice suit such as this. We thus have no doubt that the City considered its system to be valid and that it had no intention of departing from it when it agreed to the 1980 decree.

Finally, it must be remembered that neither the Union nor the nonminority employees were parties to the suit when the 1980 decree was entered. Hence the entry of that decree cannot be said to indicate any agreement by them to any of its terms. Absent the presence of the Union or the nonminority employees and an opportunity for them to agree or disagree with any provisions of the decree that might encroach on their rights, it seems highly unlikely that the City would purport to bargain away nonminority rights under the then-existing seniority system. We therefore conclude that the injunction does not merely enforce the agreement of the

parties as reflected in the consent decree. If the injunction is to stand, it must be justified on some other basis.

### B

The Court of Appeals held that even if the injunction is not viewed as compelling compliance with the terms of the decree, it was still properly entered because the District Court had inherent authority to modify the decree when an economic crisis unexpectedly required layoffs which, if carried out as the City proposed, would undermine the affirmative action outlined in the decree and impose an undue hardship on respondents. This was true, the court held, even though the modification conflicted with a bona fide seniority system adopted by the City. The Court of Appeals erred in reaching this conclusion.[9]

---

[9] The dissent seems to suggest, *post,* at 611, and n. 9, and JUSTICE STEVENS expressly states, *post,* at 590, that Title VII is irrelevant in determining whether the District Court acted properly in modifying the consent decree. However, this was Title VII litigation, and in affirming modifications of the decree, the Court of Appeals relied extensively on what it considered to be its authority under Title VII. That is the posture in which the cases come to us. Furthermore, the District Court's authority to impose a modification of a decree is not wholly dependent on the decree. "[T]he District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce," not from the parties' consent to the decree. *Railway Employees* v. *Wright,* 364 U. S. 642, 651 (1961). In recognition of this principle, this Court in *Wright* held that when a change in the law brought the terms of a decree into conflict with the statute pursuant to which the decree was entered, the decree should be modified over the objections of one of the parties bound by the decree. By the same token, and for the same reason, a district court cannot enter a disputed modification of a consent decree in Title VII litigation if the resulting order is inconsistent with that statute.

Thus, Title VII necessarily acted as a limit on the District Court's authority to modify the decree over the objections of the City; the issue cannot be resolved solely by reference to the terms of the decree and notions of equity. Since, as we note, *infra,* at 577, Title VII precludes a district court from displacing a nonminority employee with seniority under

Section 703(h) of Title VII provides that it is not an unlawful employment practice to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority system, provided that such differences are not the result of an intention to discriminate because of race.[10]  It is clear that the City had a seniority system, that its proposed layoff plan conformed to that system, and that in making the settlement the City had not agreed to award competitive seniority to any minority employee whom the City proposed to lay off.  The District Court held that the City could not follow its seniority system in making its proposed layoffs because its proposal was discriminatory in effect and hence not a bona fide plan. Section 703(h), however, permits the routine application of a seniority system absent proof of an intention to discriminate. *Teamsters* v. *United States*, 431 U. S. 324, 352 (1977). Here, the District Court itself found that the layoff proposal was not adopted with the purpose or intent to discriminate on the basis of race.  Nor had the City in agreeing to the decree admitted in any way that it had engaged in intentional discrimination.  The Court of Appeals was therefore correct in disagreeing with the District Court's holding that the layoff plan was not a bona fide application of the seniority system, and it would appear that the City could not be faulted for following the seniority plan expressed in its agreement with

the contractually established seniority system absent either a finding that the seniority system was adopted with discriminatory intent or a determination that such a remedy was necessary to make whole a proven victim of discrimination, the District Court was precluded from granting such relief over the City's objection in these cases.

[10] Section 703 (h) provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ."  42 U. S. C. § 2000e–2(h).

the Union. The Court of Appeals nevertheless held that the injunction was proper even though it conflicted with the seniority system. This was error.

To support its position, the Court of Appeals first proposed a "settlement" theory, *i. e.*, that the strong policy favoring voluntary settlement of Title VII actions permitted consent decrees that encroached on seniority systems. But at this stage in its opinion, the Court of Appeals was supporting the proposition that even if the injunction was not merely enforcing the agreed-upon terms of the decree, the District Court had the authority to modify the decree over the objection of one of the parties. The settlement theory, whatever its merits might otherwise be, has no application when there is no "settlement" with respect to the disputed issue. Here, the agreed-upon decree neither awarded competitive seniority to the minority employees nor purported in any way to depart from the seniority system.

A second ground advanced by the Court of Appeals in support of the conclusion that the injunction could be entered notwithstanding its conflict with the seniority system was the assertion that "[i]t would be incongruous to hold that the use of the preferred means of resolving an employment discrimination action decreases the power of a court to order relief which vindicates the policies embodied within Title VII and 42 U. S. C. §§ 1981 and 1983." 679 F. 2d, at 566. The court concluded that if the allegations in the complaint had been proved, the District Court could have entered an order overriding the seniority provisions. Therefore, the court reasoned, "[t]he trial court had authority to override the Firefighter's Union seniority provisions to effectuate the purpose of the 1980 Decree." *Ibid.*

The difficulty with this approach is that it overstates the authority of the trial court to disregard a seniority system in fashioning a remedy after a plaintiff has successfully proved that an employer has followed a pattern or practice having a discriminatory effect on black applicants or employees. If individual members of a plaintiff class demonstrate that they

have been actual victims of the discriminatory practice, they may be awarded competitive seniority and given their rightful place on the seniority roster.   This much is clear from *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976), and *Teamsters* v. *United States, supra.   Teamsters*, however, also made clear that mere membership in the disadvantaged class is insufficient to warrant a seniority award; each individual must prove that the discriminatory practice had an impact on him.   431 U. S., at 367–371.   Even when an individual shows that the discriminatory practice has had an impact on him, he is not automatically entitled to have a nonminority employee laid off to make room for him.   He may have to wait until a vacancy occurs,[11] and if there are nonminority employees on layoff, the court must balance the equities in determining who is entitled to the job.   *Teamsters, supra,* at 371–376.   See also *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 236–240 (1982).   Here, there was no finding that any of the blacks protected from layoff had been a victim of discrimination and no award of competitive seniority to any of them.   Nor had the parties in formulating the consent decree purported to identify any specific employee entitled to particular relief other than those listed in the exhibits attached to the decree.   It therefore seems to us that in light of *Teamsters*, the Court of Appeals imposed on the parties as an adjunct of settlement something that could not have been ordered had the case gone to trial and the plaintiffs proved that a pattern or practice of discrimination existed.

Our ruling in *Teamsters* that a court can award competitive seniority only when the beneficiary of the award has actually been a victim of illegal discrimination is consistent with the policy behind § 706(g) of Title VII, which affects the remedies

---

[11] Lower courts have uniformly held that relief for actual victims does not extend to bumping employees previously occupying jobs.   See, *e. g., Patterson* v. *American Tobacco Co.*, 535 F. 2d 257, 267 (CA4), cert. denied, 429 U. S. 920 (1976); *Local 189, United Papermakers and Paperworkers* v. *United States*, 416 F. 2d 980, 988 (CA5 1969), cert. denied, 397 U. S. 919 (1970).

available in Title VII litigation.[12]   That policy, which is to provide make-whole relief only to those who have been actual victims of illegal discrimination, was repeatedly expressed by the sponsors of the Act during the congressional debates. Opponents of the legislation that became Title VII charged that if the bill were enacted, employers could be ordered to hire and promote persons in order to achieve a racially balanced work force even though those persons had not been victims of illegal discrimination.[13]   Responding to these charges, Senator Humphrey explained the limits on a court's remedial powers as follows:

> "No court order can require hiring, reinstatement, admission to membership, or payment of back pay for anyone who was not fired, refused employment or advancement or admission to a union by an act of discrimination forbidden by this title.   This is stated expressly in the last sentence of section 707(e) [enacted without relevant change as § 706(g)] . . . .   Contrary to the allegations of some opponents of this title, there is nothing in it that

[12] Section 706(g) provides: "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. . . . No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of § 704(a) of this title."   86 Stat. 107, 42 U. S. C. § 2000e–5(g).

[13] See H. R. Rep. No. 914, 88th Cong., 1st Sess., 72–73 (1963) (minority report); 110 Cong. Rec. 4764 (1964) (remarks of Sen. Ervin and Sen. Hill); id., at 5092, 7418–7420 (remarks of Sen. Robertson); id., at 8500 (remarks of Sen. Smathers); id., at 9034–9035 (remarks of Sen. Stennis and Sen. Tower).

will give any power to the Commission or to any court to require . . . firing . . . of employees in order to meet a racial 'quota' or to achieve a certain racial balance.   That bugaboo has been brought up a dozen times; but it is nonexistent."   110 Cong. Rec. 6549 (1964).

An interpretative memorandum of the bill entered into the Congressional Record by Senators Clark and Case [14] likewise made clear that a court was not authorized to give preferential treatment to nonvictims.   "No court order can require hiring, reinstatement, admission to membership, or payment of back pay for anyone who was not discriminated against in violation of [Title VII].   This is stated expressly in the last sentence of section [706(g)] . . . ."   *Id.*, at 7214.

Similar assurances concerning the limits on a court's authority to award make-whole relief were provided by supporters of the bill throughout the legislative process.   For example, following passage of the bill in the House, its Republican House sponsors published a memorandum describing the bill.   Referring to the remedial powers given the courts by the bill, the memorandum stated: "Upon conclusion of the trial, the Federal court may enjoin an employer or labor organization from practicing further discrimination and may order the hiring or reinstatement of an employee or the acceptance or reinstatement of a union member.   *But title VII does not permit the ordering of racial quotas in businesses or unions* . . . ."   *Id.*, at 6566 (emphasis added).   In like manner, the principal Senate sponsors, in a bipartisan newsletter delivered during an attempted filibuster to each Senator supporting the bill, explained that "[u]nder title VII, not even a court, much less the Commission, could order racial quotas or the hiring, reinstatement, admission to mem-

---

[14] Senators Clark and Case were the bipartisan "captains" of Title VII. We have previously recognized the authoritative nature of their interpretative memorandum.   *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 73 (1982); *Teamsters* v. *United States*, 431 U. S. 324, 352 (1977).

bership or payment of back pay for anyone who is not discriminated against in violation of this title." *Id.*, at 14465.[15]

The Court of Appeals holding that the District Court's order was permissible as a valid Title VII remedial order ignores not only our ruling in *Teamsters* but the policy behind

---

[15] The dissent suggests that Congress abandoned this policy in 1972 when it amended § 706(g) to make clear that a court may award "any other equitable relief" that the court deems appropriate. *Post*, at 619–620. As support for this proposition the dissent notes that prior to 1972, some federal courts had provided remedies to those who had not proved that they were victims. It then observes that in a section-by-section analysis of the bill, its sponsors stated that "in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII." 118 Cong. Rec. 7167 (1972).

We have already rejected, however, the contention that Congress intended to codify all existing Title VII decisions when it made this brief statement. See *Teamsters, supra*, at 354, n. 39. Moreover, the statement on its face refers only to those sections not changed by the 1972 amendments. It cannot serve as a basis for discerning the effect of the changes that were made by the amendment. Finally, and of most importance, in a later portion of the same section-by-section analysis, the sponsors explained their view of existing law and the effect that the amendment would have on that law.

"The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present § 706(g) *the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole,* and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that *persons aggrieved by the consequences and effects of the unlawful employment practice* be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." 118 Cong. Rec., at 7168 (emphasis added).

As we noted in *Franks*, the 1972 amendments evidence "emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible *the victims of racial discrimination.*" 424 U. S., at 764 (emphasis added).

§ 706(g) as well.   Accordingly, that holding cannot serve as a basis for sustaining the District Court's order.[16]

Finally, the Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally could have done by way of adopting an affirmative-action program.   Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide.   The fact is that in these cases the City took no such action and that the modification of the decree was imposed over its objection.[17]

We thus are unable to agree either that the order entered by the District Court was a justifiable effort to enforce the terms of the decree to which the City had agreed or that it was a legitimate modification of the decree that could be imposed on the City without its consent.   Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

The various views presented in the opinions in these cases reflect the unusual procedural posture of the cases and the difficulties inherent in allocating the burdens of recession and fiscal austerity.   I concur in the Court's treatment of these

---

[16] Neither does it suffice to rely on the District Court's remedial authority under §§ 1981 and 1983.   Under those sections relief is authorized only when there is proof or admission of intentional discrimination.   *Washington* v. *Davis*, 426 U. S. 229 (1976); *General Building Contractors Assn.* v. *Pennsylvania*, 458 U. S. 375 (1982).   Neither precondition was satisfied here.

[17] The Court of Appeals also suggested that under *United States* v. *Swift & Co.*, 286 U. S. 106, 114–115 (1932), the decree properly was modified pursuant to the District Court's equity jurisdiction.   But *Swift* cannot be read as authorizing a court to impose a modification of a decree that runs counter to statutory policy, see n. 9, *supra*, here §§ 703(h) and 706(g) of Title VII.

difficult issues, and write separately to reflect my understanding of what the Court holds today.

## I

To appreciate the Court's disposition of the mootness issue, it is necessary to place these cases in their complete procedural perspective. The parties agree that the District Court and the Court of Appeals were presented with a "case or controversy" in every sense contemplated by Art. III of the Constitution. Respondents, as trial-plaintiffs, initiated the dispute, asking the District Court preliminarily to enjoin the City from reducing the percentage of minority employees in various job classifications within the Fire Department. Petitioners actively opposed that motion, arguing that respondents had waived any right to such relief in the consent decree itself and, in any event, that the reductions-in-force were bona fide applications of the citywide seniority system. When the District Court held against them, petitioners followed the usual course of obeying the injunction and prosecuting an appeal. They were, however, unsuccessful on that appeal.

Respondents now claim that the cases have become moot on certiorari to this Court. The recession is over, the employees who were laid off or demoted have been restored to their former jobs, and petitioners apparently have no current need to make seniority-based layoffs. The res judicata effects of the District Court's order can be eliminated by the Court's usual practice of vacating the decision below and remanding with instructions to dismiss. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950). Thus, respondents conclude that the validity of the preliminary injunction is no longer an issue of practical significance and the cases can be dismissed as moot. See Brief for Respondents 26–28.

I agree with the Court that petitioners and respondents continue to wage a controversy that would not be resolved by merely vacating the preliminary injunction. As a result of

the District Court's order, several black employees have more seniority for purposes of future job decisions and entitlements than they otherwise would have under the City's seniority system. This added seniority gives them an increased expectation of future promotion, an increased priority in bidding on certain jobs and job transfers, and an increased protection from future layoffs. These individuals, who are members of the respondent class, have not waived their increased seniority benefits. Therefore, petitioners have a significant interest in determining those individuals' claims in the very litigation in which they were originally won. As the Court of Appeals noted, if petitioner-employer does not vigorously defend the implementation of its seniority system, it will have to cope with deterioration in employee morale, labor unrest, and reduced productivity. See 679 F. 2d 541, 555, and n. 12 (CA6 1982); see also *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 229 (1982). Likewise, if petitioner-union accedes to discriminatory employment actions, it will lose both the confidence of its members and bargaining leverage in the determination of who should ultimately bear the burden of the past (and future) fiscal shortages. See *ante*, at 571, and n. 5. Perhaps this explains why, in respondents' words, "the city and union have expended substantial time and effort . . . in [an] appeal which can win no possible relief for the individuals on whose behalf it has ostensibly been pursued." Brief for Respondents 44.

When collateral effects of a dispute remain and continue to affect the relationship of litigants,[1] the case is not moot.

---

[1] This case is distinguishable from *University of Texas* v. *Camenisch*, 451 U. S. 390 (1981), where the Court found that a petitioner's objections to a preliminary injunction, which required it to pay for the respondent's sign-language interpreter, were moot. In *Camenisch*, the propriety of issuing the preliminary injunction was really no longer of concern to the parties, and the real issue—who should pay for the interpreter—was better handled in a separate proceeding. *Id.*, at 394–398. In these cases, because the parties are in an ongoing relationship, they have a continuing

See, *e. g.*, *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 755–757 (1976); *Super Tire Engineering Co.* v. *McCorkle*, 416 U. S. 115, 121–125 (1974); *Gray* v. *Sanders*, 372 U. S. 368, 375–376 (1963). In such cases, the Court does not hesitate to provide trial defendants with "a definitive disposition of their objections" on appeal, *Pasadena City Bd. of Education* v. *Spangler*, 427 U. S. 424, 440 (1976), because vacating the res judicata effects of the decision would not bring the controversy to a close. See Note, Mootness on Appeal in the Supreme Court, 83 Harv. L. Rev. 1672, 1677–1687 (1970). As the Court wisely notes, "[litigants] cannot invoke the jurisdiction of a federal court . . . and then insulate [the effects of that court's] ruling from appellate review by claiming that they are no longer interested in the matter." *Ante*, at 572.

## II

My understanding of the Court's holding on the merits also is aided by a review of the place this case takes in the history of the parties' litigation. The City entered into a consent decree with respondents, agreeing to certain hiring and promotional goals, backpay awards, and individual promotions. The City was party both to another consent decree and to an agreement with the union concerning application of the seniority system at the time it made these concessions. Respondents did not seek the union's participation in the negotiation of their consent decree with the City, did not include the seniority system as a subject of negotiation, and waived all rights to seek further relief. When the current dispute arose, the District Court rejected respondents' allegation that the seniority system had been adopted or applied with any discriminatory animus. It held, however, that "modification" was appropriate because of the seniority system's discriminatory effects. Under these circumstances, the Court's

---

interest in the propriety of the preliminary relief itself. *Camenisch* expressly distinguishes cases like these, where the parties retain "a legally cognizable interest in the determination whether the preliminary injunction was properly granted." *Id.*, at 394; see also *id.*, at 397, and n. 2.

conclusion that the District Court had no authority to order maintenance of racial percentages in the Department is, in my view, inescapable.

Had respondents presented a plausible case of discriminatory animus in the adoption or application of the seniority system, then the Court would be hard pressed to consider entry of the preliminary injunction an abuse of discretion. But that is not what happened here. To the contrary, the District Court rejected the claim of discriminatory animus, and the Court of Appeals did not disagree. Furthermore, the District Court's erroneous conclusion to the contrary, maintenance of racial balance in the Department could not be justified as a correction of an employment policy with an unlawful disproportionate impact. Title VII affirmatively protects bona fide seniority systems, including those with discriminatory effects on minorities. See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 65 (1982); *Teamsters* v. *United States*, 431 U. S. 324, 352 (1977).

Therefore, the preliminary injunction could only be justified as a reasonable interpretation of the consent decree or as a permissible exercise of the District Court's authority to modify that consent decree. Neither justification was present here. For the reasons stated by the Court, *ante,* at 574–576, and JUSTICE STEVENS, *post,* at 591, the consent decree itself cannot fairly be interpreted to bar use of the seniority policy or to require maintenance of racial balances previously achieved in the event layoffs became necessary. Nor can a district court unilaterally modify a consent decree to adjust racial imbalances or to provide retroactive relief that abrogates legitimate expectations of other employees and applicants. See *Steelworkers* v. *Weber*, 443 U. S. 193, 205–207 (1979); *Pasadena City Bd. of Education* v. *Spangler, supra,* at 436–438. A court may not grant preferential treatment to any individual or group simply because the group to which they belong is adversely affected by a bona fide seniority system. Rather, a court may use its remedial powers, including its power to modify a consent decree, only to pre-

vent future violations and to compensate identified victims of unlawful discrimination. See *Teamsters* v. *United States, supra*, at 367–371; *Milliken* v. *Bradley*, 433 U. S. 267, 280–281 (1977); see also *University of California Regents* v. *Bakke*, 438 U. S. 265, 307–309, and n. 44 (1978) (POWELL, J., announcing the judgment of the Court). Even when its remedial powers are properly invoked, a district court may award preferential treatment only after carefully balancing the competing interests of discriminatees, innocent employees, and the employer. See *Ford Motor Co.* v. *EEOC*, 458 U. S., at 239–240; *Teamsters* v. *United States, supra*, at 371–376. In short, no matter how significant the change in circumstance, a district court cannot unilaterally modify a consent decree to adjust racial balances in the way the District Court did here.[2]

To be sure, in 1980, respondents could have gone to trial and established illegal discrimination in the Department's past hiring practices, identified its specific victims, and possibly obtained retroactive seniority for those individuals. Alternatively, in 1980, in negotiating the consent decree, respondents could have sought the participation of the union,[3] negotiated the identities of the specific victims with the union and employer, and possibly obtained limited forms of retroactive relief. But respondents did none of these things. They chose to avoid the costs and hazards of litigating their claims. They negotiated with the employer without inviting the union's participation. They entered into a consent decree

---

[2] Unlike the dissenters and JUSTICE STEVENS, I find persuasive the Court's reasons for holding Title VII relevant to analysis of the modification issue, see *ante*, at 576–577, n. 9, and the Court's application of Title VII's provisions to the facts of the present controversy.

[3] "Absent a judicial determination, . . . the Company . . . cannot alter the collective-bargaining agreement without the Union's consent." *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757, 771 (1983). Thus, if innocent employees are to be required to make any sacrifices in the final consent decree, they must be represented and have had full participation rights in the negotiation process.

without establishing any specific victim's identity. And, most importantly, they waived their right to seek further relief. To allow respondents to obtain relief properly reserved for only identified victims or to prove their victim status now would undermine the certainty of obligation that is a condition precedent to employers' acceptance of, and unions' consent to, employment discrimination settlements. See *Steelworkers* v. *Weber, supra,* at 211 (BLACKMUN, J., concurring) (employers enter into settlements to avoid backpay responsibilities and to reduce disparate impact claims). Modifications requiring maintenance of racial balance would not encourage valid settlements[4] of employment discrimination cases. They would impede them. Thus, when the Court states that this preferential relief could not have been awarded even had *this case* gone to trial, see *ante,* at 579, it is holding respondents to the bargain they struck during the consent decree negotiations in 1980 and thereby furthering the statutory policy of voluntary settlement. See *Carson* v. *American Brands, Inc.,* 450 U. S. 79, 88, and n. 14 (1981).

In short, the Court effectively applies the criteria traditionally applicable to the review of preliminary injunctions. See *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 931 (1975). When the Court disapproves the preliminary injunction issued in this litigation, it does so because respondents had no chance of succeeding on the merits of their claim. The District Court had no authority to order the Department to maintain its current racial balance or to provide preferential

---

[4] The policy favoring voluntary settlement does not, of course, countenance unlawful discrimination against existing employees or applicants. See *McDonald* v. *Santa Fe Trail Transportation Co.,* 427 U. S. 273, 278–296 (1976) (Title VII and 42 U. S. C. § 1981 prohibit discrimination against whites as well as blacks); *Steelworkers* v. *Weber,* 443 U. S. 193, 208–209 (1979) (listing attributes that would make affirmative action plan impermissible); cf. *id.,* at 215 (BLACKMUN, J., concurring) ("[S]eniority is not in issue because the craft training program is new and does not involve an abrogation of pre-existing seniority rights").

treatment to blacks. It therefore abused its discretion. On this understanding, I join the opinion and judgment rendered by the Court today.

JUSTICE STEVENS, concurring in the judgment.

The District Court's preliminary injunction remains reviewable because of its continuing effect on the city's personnel policies. That injunction states that the city may "not apply the seniority policy proposed insofar as it will decrease the percentage of black [persons] in the Memphis Fire Department."[1] Thus, if the city faces a need to lay off Fire Department employees in the future, it may not apply its seniority system. I cannot say that the likelihood that the city will once again face the need to lay off Fire Department employees is so remote that the city has no stake in the outcome of this litigation.[2]

In my judgment, the Court's discussion of Title VII is wholly advisory. These cases involve no issue under Title VII; they involve only the administration of a consent decree. The District Court entered the consent decree on April 25, 1980, after having given all parties, including all of the petitioners in this Court, notice and opportunity to object to its entry. The consent decree, like any other final judgment of a district court, was immediately appealable. See *Carson* v. *American Brands, Inc.*, 450 U. S. 79 (1981). No appeal was taken. Hence, the consent decree became a final judgment binding upon those who had had notice and opportunity to

---

[1] See also n. 6, *infra*. There were actually three injunctive orders entered by the District Court, each applying to different positions in the Memphis Fire Department. All use substantially the same language.

[2] In this respect, this litigation is similar to *Los Angeles* v. *Lyons*, 461 U. S. 95, 100–101 (1983). There, an injunction against the use of chokeholds by the city's police department was held not to be moot despite the fact that the police board had instituted a voluntary moratorium of indefinite duration on chokeholds, since the likelihood that the city might one day wish to return to its former policy was not so remote as to moot the case. See also *Carroll* v. *Princess Anne*, 393 U. S. 175, 178–179 (1968).

object; it was and is a legally enforceable obligation. If the consent decree justified the District Court's preliminary injunction, then that injunction should be upheld irrespective of whether Title VII would authorize a similar injunction.[3] Therefore, what governs these cases is not Title VII, but the consent decree.[4]

There are two ways in which the District Court's injunction could be justified. The first is as a construction of the consent decree. If the District Court had indicated that it was merely enforcing the terms of the consent decree, and had given some indication of what portion of that decree it was interpreting, I might be hard pressed to consider the entry of the injunction an abuse of discretion. However, the District Court never stated that it was construing the decree, nor did it provide even a rough indication of the portion of the decree on which it relied. There is simply nothing in the record to justify the conclusion that the injunction was based on a reasoned construction of the consent decree.[5]

---

[3] The Court seems to suggest that a consent decree cannot authorize anything that would not constitute permissible relief under Title VII. *Ante*, at 578–579. I share JUSTICE BLACKMUN's doubts as to whether this is the correct test. See *post*, at 611, n. 9, 614–616. The provisions on which the Court relies, 42 U. S. C. §§ 2000e–2(h) and 2000e–5(g), merely state that certain seniority arrangements do not violate Title VII, and define the limits of appropriate relief for a Title VII violation, respectively. They do not place any limitations on what the parties can agree to in a consent decree. The Court does not suggest that any other statutory provision was violated by the District Court. The Court itself acknowledges that the administration of a consent decree must be tested by the four corners of the decree, and not by what might have been ordered had respondents prevailed on the merits, *ante*, at 574, which makes its subsequent discussion of Title VII all the more puzzling.

[4] If the decree had been predicated on a finding that the city had violated Title VII, the remedial policies underlying that Act might be relevant, at least as an aid to construction of the decree. But since the settlement expressly disavowed any such finding, the Court's exposition of Title VII law is unnecessary.

[5] JUSTICE BLACKMUN explains, *post*, at 607–610, how the consent decree could be construed to justify the injunction. I find nothing in the record

The second justification that could exist for the injunction is that the District Court entered it based on a likelihood that it would modify the decree, or as an actual modification of the decree.[6]  As JUSTICE BLACKMUN explains, *post*, at 607, 610–611, modification would have been appropriate if respondents had demonstrated the presence of changed circumstances. However, the only "circumstance" found by the District Court was that the city's proposed layoffs would have an adverse effect on the level of black employment in the fire department.  App. to Pet. for Cert. in No. 82–206, pp. A73–A76.  This was not a "changed" circumstance; the percentage of blacks employed by the Memphis Fire Department at the time the decree was entered meant that even then it was apparent that any future seniority-based layoffs would have an adverse effect on blacks.  Thus the finding made by the District Court was clearly insufficient to support a modification of the consent decree, or a likelihood thereof.

Accordingly, because I conclude that the District Court abused its discretion in entering the preliminary injunction at issue here, I concur in the judgment.

---

indicating that this is the theory the District Court actually employed. While I recognize that preliminary injunction proceedings are often harried affairs and that district courts need substantial leeway in resolving them, it nevertheless remains the case that there must be something in the record explaining the reasoning of the District Court before it may be affirmed. That is the purpose of Federal Rule of Civil Procedure 65(d)'s requirement that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance . . . ."

[6] It seems likely that this second justification was the actual basis for the entry of the injunction.  The District Court's phrasing of the question it faced was whether "it should exercise its authority to modify a Consent Decree," App. to Pet. for Cert. A73.  The focus of the Court of Appeals' opinion reviewing the preliminary injunction was the "three grounds upon which a consent decree may later be modified," 679 F. 2d 541, 560 (CA6 1981).  Most important, the practical effect of the District Court's action indicates that it should be treated as a modification.  Until it is reviewed, it will effectively govern the procedure that the city must follow in any future layoffs, and that procedure is significantly different from the seniority system in effect when the consent decree was negotiated and signed.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Today's opinion is troubling less for the law it creates than for the law it ignores. The issues in these cases arose out of a preliminary injunction that prevented the city of Memphis from conducting a particular layoff in a particular manner. Because that layoff has ended, the preliminary injunction no longer restrains any action that the city wishes to take. The Court nevertheless rejects respondents' claim that these cases are moot because the Court concludes that there are continuing effects from the preliminary injunction and that these create a continuing controversy. The Court appears oblivious, however, to the fact that any continuing legal consequences of the preliminary injunction would be erased by simply vacating the Court of Appeals' judgment, which is this Court's longstanding practice with cases that become moot.

Having improperly asserted jurisdiction, the Court then ignores the proper standard of review. The District Court's action was a preliminary injunction reviewable only on an abuse-of-discretion standard; the Court treats the action as a permanent injunction and decides the merits, even though the District Court has not yet had an opportunity to do so. On the merits, the Court ignores the specific facts of these cases that make inapplicable the decisions on which it relies. Because, in my view, the Court's decision is demonstrably in error, I respectfully dissent.

I

*Mootness.* "The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe* v. *Wade,* 410 U. S. 113, 125 (1973). In the absence of a live controversy, the constitutional requirement of a "case" or "controversy," see U. S. Const., Art. III, deprives a federal court of jurisdiction. Accordingly, a case, although live at the start, becomes moot when intervening acts destroy the

interest of a party to the adjudication. *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974). In such a situation, the federal practice is to vacate the judgment and remand the case with a direction to dismiss. *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950).

Application of these principles to the present cases is straightforward. The controversy underlying the suits is whether the city of Memphis' proposed layoff plan violated the 1980 consent decree. The District Court granted a preliminary injunction limiting the proportion of Negroes that the city could lay off as part of its efforts to solve its fiscal problems. Because of the injunction, the city chose instead to reduce its work force according to a modified layoff plan under which some whites were laid off despite their greater seniority over the blacks protected by the preliminary injunction. Since the preliminary injunction was entered, however, the layoffs all have terminated and the city has taken back every one of the workers laid off pursuant to the modified plan. Accordingly, the preliminary injunction no longer restrains the city's conduct, and the adverse relationship between the opposing parties concerning its propriety is gone. A ruling in this situation thus becomes wholly advisory, and ignores the basic duty of this Court " 'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Oil Workers* v. *Missouri*, 361 U. S. 363, 367 (1960), quoting *Mills* v. *Green*, 159 U. S. 651, 653 (1895). The proper disposition, therefore, is to vacate the judgment and remand the cases with directions to dismiss them as moot.

The purpose of vacating a judgment when it becomes moot while awaiting review is to return the legal relationships of the parties to their status prior to initiation of the suit. The Court explained in *Munsingwear* that vacating a judgment

"clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary." 340 U. S., at 40.

Were the Court to follow this procedure in these cases, as clearly it should, the legal rights of the parties would return to their status prior to entry of the preliminary injunction. In the event that future layoffs became necessary, respondents would have to seek a new injunction based on the facts presented by the new layoffs, and petitioners could oppose the new injunction on any and all grounds, including arguments similar to those made in these cases.

Struggling to find a controversy on which to base its jurisdiction, the Court offers a variety of theories as to why these cases remain live. First, it briefly suggests that the cases are not moot because the preliminary injunction continues in effect and would apply in the event of a future layoff. My fundamental disagreement with this contention is that it incorrectly interprets the preliminary injunction.[1] Even if the

---

[1] It is readily apparent from the terms of the preliminary injunction that it applied only to the layoffs contemplated in May 1981, and that the union would have to seek a new injunction if it sought to stop layoffs contemplated in the future. The preliminary injunction applied only to the positions—lieutenant, driver, inspector, and private—in which demotions or layoffs were then planned. It makes little sense to interpret this preliminary injunction to apply to future layoffs that might involve different positions. In addition, the minimum percentage of Negroes that the city was to retain was that of blacks "presently employed" in those positions, a standard that has no pertinence if applied to future layoffs when minority employment levels would be higher than in 1981. App. to Pet. for Cert. in No. 82–229, p. A77. Finally, the reasoning of the District Court in granting the preliminary injunction was based expressly on "the effect of *these* lay-offs and reductions in rank." *Id.*, at A78 (emphasis supplied). Thus,

Court's interpretation of the preliminary injunction is correct, however, it is nonetheless true that if the judgment in these cases were vacated, the preliminary injunction would not apply to a future layoff.

The Court's second argument against mootness is remarkable. The Court states that even if the preliminary injunction applies only to the 1981 layoffs, the "rulings" that formed the "predicate" for the preliminary injunction "remain undisturbed." *Ante*, at 569. The Court then states:

> "[W]e see no indication that respondents concede in urging mootness that these rulings were in error and should be reversed. To the contrary, they continue to defend them. Unless overturned, these rulings would require the City to obey the modified consent decree and to disregard its seniority agreement in making future layoffs." *Ibid.*

Two aspects of this argument provoke comment. It is readily apparent that vacating the judgment in these cases would also vacate whatever "rulings" formed the "predicate" for that judgment. There simply is no such thing as a "ruling" that has a life independent of the judgment in these cases and that would bind the city in a future layoff if the judgment in these cases were vacated. The Court's argument, therefore, is nothing more than an oxymoronic suggestion that the judgment would somehow have a res judicata effect even if it was vacated—a complete contradiction in terms.

Moreover, and equally remarkable, is the notion that respondents must concede that the rulings below were in error before they can argue that the cases are moot. To my knowledge, there is nothing in this Court's mootness doctrine that requires a party urging mootness to concede the lack of

---

it is clear that that the District Court viewed the preliminary injunction as a response to the problem presented by the May 1981 layoffs rather than to the problem of layoffs generally.

merit in his case. Indeed, a central purpose of mootness doctrine is to avoid an unnecessary ruling on the merits.

The Court's third argument against mootness focuses on the wages and seniority lost by white employees during the period of their layoffs—and it is undisputed that some such pay and seniority were lost. The Court does not suggest, however, that its decision today will provide the affected workers with any backpay or seniority. It is clear that any such backpay or retroactive seniority for laid-off workers would have to come from the city, not from respondents.[2] But the city Fire Department and the union are both *petitioners* here, not adversaries, and respondents have no interest in defending the city from liability to the union in a separate proceeding. For that reason, these suits involve the wrong adverse parties for resolution of any issues of backpay and seniority.

The Court, nevertheless, suggests that the backpay and seniority issues somehow keep these cases alive despite the absence of an adversarial party. The Court states:

> "Unless the judgment of the Court of Appeals is reversed, however, the layoffs and demotions were in accordance with the law, and it would be quite unreasonable to expect the City to pay out money to which the employees had no legal right. Nor would it feel free to respond to the seniority claims of the three white employees who . . . lost competitive seniority in relation to all other individuals who were not laid off, including those minority employees who would have been laid off but for the injunction. On the other hand, if the Court

---

[2] In the event that the laid-off firefighters were to bring a successful action for backpay against the city, the city would have no claim for reimbursement against respondents for securing an allegedly erroneous injunction. No bond was posted for the preliminary injunction, and "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757, 770, n. 14 (1983).

of Appeals' judgment is reversed, the City would be free to take a wholly different position with respect to backpay and seniority." *Ante,* at 571 (footnote omitted).

Although the artful ambiguity of this passage renders it capable of several interpretations, none of them provides a basis on which to conclude that these cases are not moot. The Court may mean to suggest that the city has no legal obligation to provide backpay and retroactive seniority, but that it might voluntarily do so if this Court opines that the preliminary injunction was improper. A decision in that situation, however, would be an advisory opinion in the full sense—it would neither require nor permit the city to do anything that it cannot do already.

It is more likely that the Court means one of two other things. The Court may mean that if the Court of Appeals' decision is left standing, it would have some kind of preclusive effect in a suit for backpay and retroactive seniority brought by the union against the city. Alternatively, the Court may mean that if the city sought voluntarily to give union members the backpay and retroactive seniority that they lost, the respondents could invoke the preliminary injunction to prohibit the city from doing so.

Even if both of these notions were correct—which they clearly are not, see *infra,* at 599–601, and nn. 3, 4, and 5—they are irrelevant to the question of mootness. The union has not filed a suit for backpay or seniority, nor has the preliminary injunction prevented the city from awarding retroactive seniority to the laid-off workers. Accordingly, these issues simply are not in the cases before the Court, and have no bearing on the question of mootness. In *Oil Workers* v. *Missouri,* 361 U. S. 363 (1960), for example, the Court declined to review an expired antistrike injunction issued pursuant to an allegedly unconstitutional state statute, even though the challenged statute also governed a monetary penalty claim pending in state court against the union. The Court stated: "'[T]hat suit is not before us. We have not

now jurisdiction of it or its issues. *Our power only extends over and is limited by the conditions of the case now before us.'"* *Id.*, at 370 (emphasis added), quoting *American Book Co.* v. *Kansas ex rel. Nichols,* 193 U. S. 49, 52 (1904). By vacating this judgment as moot, the Court would ensure that in the event that a controversy over backpay and retroactive seniority should arise, the parties in these cases could relitigate any issues concerning the propriety of the preliminary injunction as it relates to that controversy. Thus, the Court today simply has its reasoning backwards. It pretends that these cases present a live controversy because the judgment in them might affect future litigation; yet the Court's longstanding practice of vacating moot judgments is designed precisely to prevent that result.

By going beyond the reach of the Court's Art. III powers, today's decision improperly provides an advisory opinion for the city and the union. With regard to the city's ability to give retroactive seniority and backpay to laid-off workers, respondents concede that neither the preliminary injunction nor the Court of Appeals' judgment prohibits the city ,from taking such action,[3] Brief for Respondents 30–31. The city has not claimed any confusion over its ability to make such an award; it simply has chosen not to do so. Thus, the opinion today provides the city with a decision to ensure that it can do something that it has not claimed any interest in doing and

---

[3] It was the city's layoff policy, not the preliminary injunction, that prevented the laid-off workers from accruing seniority during their layoffs. Paragraph 6B of "Benefits" of the city's written "Layoff Policy," adopted unilaterally by the city in April 1981, states: "Employees shall not receive seniority credit during their layoff period." App. 95. If the laid-off workers are to receive retroactive seniority, it will be because the city chooses to change this policy—which they always have been free to do—not because the preliminary injunction has been invalidated. Although the Court feigns uncertainty on this matter, *ante,* at 571, n. 5, as does JUSTICE O'CONNOR in her separate opinion, *ante,* at 584–585, there is simply no indication in these cases that the city wants to give the laid-off workers retroactive seniority but is unable to do so because of the preliminary injunction.

has not been prevented from doing, and that respondents concede they have no way of stopping.

With regard to the union, the Court's imagined controversy is even more hypothetical. The Court concedes that there is doubt whether, in fact, the union possesses any enforceable contractual rights that could form the basis of a contract claim by the union against the city.[4] It is also unclear how the propriety of the preliminary injunction would affect the city's defenses in such a suit.[5] In any event, no such

---

[4] It appears that if the union enjoys any contractual rights at all, they derive from the "Memorandum of Understanding" between the union and the city, which indicates that layoffs shall be made on the basis of seniority. App. to Pet. for Cert. in No. 82–206, p. A81. The Tennessee Supreme Court recently has confirmed, however, that the Memorandum of Understanding confers no enforceable rights, *Fulenwider* v. *Firefighters Assn. Local Union 1784*, 649 S. W. 2d 268 (1982), because of state-law limits on the authority of municipalities to contract with labor organizations. Thus, the likely reason that the union has not filed a suit for backpay is because it has no enforceable rights.

I am at somewhat of a loss trying to understand the Court's suggestion that the District Court's preliminary injunction somehow prevented contract liability from arising between the city and the affected white employees. As is explained more fully *infra*, the preliminary injunction did not require the city to lay off anyone. The preliminary injunction merely prohibited the city from laying off more than a certain proportion of Negroes. In the face of that constraint, the city decided to proceed with layoffs and to lay off whites instead of the protected Negroes. If in so doing the city breached contractual rights of the white employees, those rights remained enforceable. See *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983) (employer could be held liable for breach of collective-bargaining agreement when, because women employees were protected by an injunction, it laid off male employees with greater seniority).

[5] An enjoined party is required to obey an injunction issued by a federal court within its jurisdiction even if the injunction turns out on review to have been erroneous, and failure to obey such an injunction is punishable by contempt. *Walker* v. *City of Birmingham*, 388 U. S. 307, 314 (1967). Given that the city could have been punished for contempt if it had disregarded the preliminary injunction, regardless of whether the injunction on appeal were found erroneous, it seems unlikely that a defense to a breach of contract would turn on whether the preliminary injunction is upheld on

claims have been filed. Thus, today's decision is provided on the theory that it might affect a defense that the city has not asserted, in a suit that the union has not brought, to enforce contractual rights that may not exist.

## II

Because there is now no justiciable controversy in these cases, today's decision by the Court is an improper exercise of judicial power. It is not my purpose in dissent to parallel the Court's error and speculate on the appropriate disposition of these nonjusticiable cases. In arriving at its result, however, the Court's analysis is misleading in many ways, and in other ways it is simply in error. Accordingly, it is important to note the Court's unexplained departures from precedent and from the record.

## A

Assuming, *arguendo*, that these cases are justiciable, then the only question before the Court is the validity of a *preliminary* injunction that prevented the city from conducting layoffs that would have reduced the number of Negroes in certain job categories within the Memphis Fire Department. In granting such relief, the District Court was required to consider respondents' likelihood of success on the merits, the balance of irreparable harm to the parties, and whether the injunction would be in the public interest. *University of Texas* v. *Camenisch*, 451 U. S. 390, 392 (1981); *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975). The question before a reviewing court "is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion." *Id.*, at 932.

The Court has chosen to answer a different question. The Court's opinion does not mention the standard of review for a preliminary injunction, and does not apply that standard to

appeal as opposed to the city's obligation to obey the injunction when entered.

these cases. Instead, the Court treats the cases as if they involved a *permanent* injunction, and addresses the question whether the city's proposed layoffs violated the consent decree.[6] That issue was never resolved in the District Court because the city did not press for a final decision on the merits. The issue, therefore, is not properly before this Court. After taking jurisdiction over a controversy that no longer exists, the Court reviews a decision that was never made.

In so doing, the Court does precisely what in *Camenisch, supra,* it unanimously concluded was error. *Camenisch* involved a suit in which a deaf student obtained a preliminary injunction requiring that the University of Texas pay for an interpreter to assist him in his studies. While appeal of the preliminary injunction was pending before the Court of Appeals, the student graduated. The Court of Appeals affirmed the District Court. In so doing, the appellate court

---

[6] The Court's attempt to recharacterize the preliminary injunction as a permanent one is wholly unpersuasive. Respondents' request for injunctive relief specifically sought a preliminary injunction, and carefully laid out the standards for the issuance of such an injunction. App. 20–22. Petitioners' response in opposition to the request for injunctive relief was devoted entirely to explaining that the standards for a preliminary injunction had not been met. *Id.*, at 25–28. The District Court's order granting injunctive relief was entitled an "Order Granting Preliminary Injunction," and a later order expanding the injunctive relief to include more positions was entitled an "Order Expanding Preliminary Injunction." App. to Pet. for Cert. in No. 82–229, pp. A77, A82. The Court of Appeals expressly defined the nature of its inquiry by stating:

"We must weigh whether the plaintiffs have shown a strong possibility of success on the merits, whether the plaintiff or defendant would suffer irreparable harm and whether the public interest warrants the injunction. . . . The standard of appellate review is whether the district court abused its discretion in granting the preliminary injunction.

"[The District Judge] did not abuse his discretion in granting the preliminary injunction." 679 F. 2d 541, 560 (CA6 1982).

It is hard to imagine a clearer statement that the issue considered by the Court of Appeals was the propriety of a preliminary injunction. In any event, even if the Court of Appeals went beyond the scope of its appropriate review, it would be our duty to correct that error, not to follow it.

rejected Camenisch's suggestion that his graduation rendered the case moot because the District Court had required Camenisch to post a bond before granting the preliminary injunction, and there remained the issue whether the University or Camenisch should bear the cost of the interpreter. This Court granted certiorari and vacated and remanded the case to the District Court. The Court explained:

> "The Court of Appeals correctly held that the case as a whole is not moot, since, as that court noted, it remains to be decided who should ultimately bear the cost of the interpreter. However, *the issue before the Court of Appeals was not who should pay for the interpreter, but rather whether the District Court had abused its discretion in issuing a preliminary injunction requiring the University to pay for him. . . . The two issues are significantly different, since whether the preliminary injunction should have issued depended on the balance of factors [for granting preliminary injunctions], while whether the University should ultimately bear the cost of the interpreter depends on a final resolution of the merits of Camenisch's case.*
>
> .      .      .      .      .
>
> "*Until [a trial on the merits] has taken place, it would be inappropriate for this Court to intimate any view on the merits of the lawsuit.*" 451 U. S., at 393, 398 (emphasis added).

*Camenisch* makes clear that a determination of a party's entitlement to a preliminary injunction is a separate issue from the determination of the merits of the party's underlying legal claim, and that a reviewing court should not confuse the two. Even if the issues presented by the preliminary injunction in these cases were not moot, therefore, the only issue before this Court would be the propriety of preliminary injunctive relief.[7] See also *New York State Liquor Au-*

---

[7] The distinction between the preliminary and final injunction stages of a proceeding is more than mere formalism. The time pressures involved in

*thority* v. *Bellanca*, 452 U. S. 714, 716 (1981); *Doran* v. *Salem Inn, Inc.*, 422 U. S., at 931–932, 934. It is true, of course, that the District Court and the Court of Appeals had to make a preliminary evaluation of respondents' likelihood of success on the merits, but that evaluation provides no basis for deciding the merits:

> "Since Camenisch's likelihood of success on the merits was one of the factors the District Court and the Court of Appeals considered in granting Camenisch a preliminary injunction, it might be suggested that their decisions were tantamount to decisions on the underlying merits and thus that the preliminary-injunction issue is not truly moot. . . . *This reasoning fails, however, because it improperly equates 'likelihood of success' with 'success,' and what is more important, because it ignores the significant procedural differences between preliminary and permanent injunctions.*" 451 U. S., at 394 (emphasis added).

---

a request for a preliminary injunction require courts to make determinations without the aid of full briefing or factual development, and make all such determinations necessarily provisional. Like the proceedings in *Camenisch*, those in this litigation "bear the marks of the haste characteristic of a request for a preliminary injunction." 451 U. S., at 398. The hearing on the preliminary injunction was held four days after the layoffs had been announced. With the exception of a single deposition the day before the hearing, there was no discovery. In opening the hearing, the trial judge noted: "One of the problems with these injunction hearings centers around the fact that the lawyers don't have the usual time to develop the issues, and take discovery, and exchange information, and to call on each other to state what they think the issues are . . . . I got an idea from the lawyers—I am not sure that they were finally decided on what route they were going . . . ." App. 30. It is true that the District Court made a few of what generously could be described as findings and conclusions, but, as the Court in *Camenisch* pointed out, "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." 451 U. S., at 395. Accordingly, there is simply no proper basis on which this Court legitimately can decide the question whether the city's proposed layoffs violated the consent decree.

## B

After ignoring the appropriate standard of review, the Court then focuses on an issue that is not in these cases. It begins its analysis by stating that the "issue at the heart of this case" is the District Court's power to "ente[r] an injunction requiring white employees to be laid off." *Ante*, at 572. That statement, with all respect, is simply incorrect. On its face, the preliminary injunction prohibited the city from conducting layoffs in accordance with its seniority system "insofar as it will decrease the percentage of blacks [presently employed]" in certain job categories. App. to Pet. for Cert. in No. 82–229, p. A80. The preliminary injunction did not require the city to lay off any white employees at all. In fact, several parties interested in the suit, including the union, attempted to persuade the city to avoid layoffs entirely by reducing the working hours of all Fire Department employees. See Brief for Respondents 73. Thus, although the District Court order reduced the city's options in meeting its fiscal crisis, it did not require the dismissal of white employees. The choice of a modified layoff plan remained that of the city.

This factual detail is important because it makes clear that the preliminary injunction did not abrogate the contractual rights of white employees. If the modified layoff plan proposed by the city to comply with the District Court's order abrogated contractual rights of the union, those rights remained enforceable. This Court recognized this principle just last Term in *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983), which presented a situation remarkably similar to the one here. In that case, an employer sought to conduct layoffs and faced a conflict between a Title VII conciliation agreement protecting its female employees and the seniority rights of its male employees. The employer chose to lay off male employees, who filed grievances and obtained awards for the violation of their contractual rights. In upholding the awards, this Court explained that the

dilemma faced by the employer did not render the male employees' contractual rights unenforceable:

> "Given the Company's desire to reduce its work force, it is undeniable that the Company was faced with a dilemma: it could follow the conciliation agreement as mandated by the District Court and risk liability under the collective-bargaining agreement, or it could follow the bargaining agreement and risk both a contempt citation and Title VII liability. The dilemma, however, was of the Company's own making. The Company committed itself voluntarily to two conflicting contractual obligations." *Id.*, at 767.

It is clear, therefore, that the correctness of the District Court's interpretation of the decree is irrelevant with respect to the enforceability of the union's contractual rights; those rights remained enforceable regardless of whether the city had an obligation not to lay off blacks.[8] The question in these cases remains whether the District Court's authority pursuant to the consent decree enabled it to enjoin a layoff of more than a certain number of blacks. The issue is not whether the District Court could require the city to lay off whites, or whether the District Court could abrogate contractual rights of white firefighters.

### III

Assuming, as the Court erroneously does, that the District Court entered a permanent injunction, the question on review then would be whether the District Court had authority to enter it. In affirming the District Court, the Court of Appeals suggested at least two grounds on which respondents might have prevailed on the merits.

---

[8] Judge Martin's opinion concurring in part and dissenting in part from the Sixth Circuit's decision is based on precisely this point. See 679 F. 2d, at 569.

## A

The first of these derives from the contractual characteristics of a consent decree. Because a consent decree "is to be construed for enforcement purposes basically as a contract," *United States* v. *ITT Continental Baking Co.*, 420 U. S. 223, 238 (1975), respondents had the right to specific performance of the terms of the decree. If the proposed layoffs violated those terms, the District Court could issue an injunction requiring compliance with them. Alternatively, the Court of Appeals noted that a court of equity has inherent power to modify a consent decree in light of changed circumstances. 679 F. 2d 541, 560–561 (CA6 1982). Thus, if respondents could show that changed circumstances justified modification of the decree, the District Court would have authority to make such a change.

Respondents based their request for injunctive relief primarily on the first of these grounds, and the Court's analysis of this issue is unpersuasive. The District Court's authority to enforce the terms and purposes of the consent decree was expressly reserved in ¶ 17 of the decree itself: "The Court retains jurisdiction of this action for such further orders as may be necessary or appropriate to effectuate the purposes of this decree." App. to Pet. for Cert. in No. 82–229, p. A69. Respondents relied on that provision in seeking the preliminary injunction. See Plaintiffs' Supplemental Memorandum in Support of a Preliminary Injunction 1. The decree obligated the city to provide certain specific relief to particular individuals, and to pursue a long-term goal to "raise the black representation in each job classification on the fire department to levels approximating the black proportion of the civilian labor force in Shelby County." App. to Pet. for Cert. in No. 82–229, p. A64. The decree set more specific goals for hiring and promotion opportunities as well. To meet these goals, the decree "require[d] reasonable, good faith efforts on the part of the City." *Ibid.*

In support of their request for a preliminary injunction, respondents claimed that the proposed layoffs would adversely affect blacks significantly out of proportion to their representation. Plaintiffs' Supplemental Memorandum in Support of a Preliminary Injunction, pp. 1–2. They argued that the proposed layoffs were "designed to thwart gains made by blacks" under the decree. *Id.*, at 2. Their argument emphasized that the Mayor had "absolute discretion to choose which job classifications" were to be affected by the layoffs, *ibid.*, and that the "ranks chosen by the Mayor for demotion are those where blacks are represented in the greatest number." *Id.*, at 4. Respondents claimed that such a layoff plan "violates the spirit of the 1980 Consent Decree." *Id.*, at 3. Had respondents been able to prove these charges at trial, they may well have constituted a violation of the city's obligation of good faith under the decree. On the basis of these claims, the limited evidence presented at the hearing prior to the issuance of the preliminary injunction, and the District Court's familiarity with the city's past behavior, the District Court enjoined the city from laying off blacks where the effect would have been to reduce the percentage of black representation in certain job categories. By treating the District Court's injunction as a permanent one, however, the Court first deprives respondents of the opportunity to substantiate these claims, and then faults them for having failed to do so. But without determining whether these allegations have any substance, there is simply no way to determine whether the proposed layoff plan violated the terms of the consent decree.

Even if respondents could not have shown that the proposed layoff plan conflicted with the city's obligation of good faith, ¶ 17 of the decree also empowered the District Court to enter orders to "effectuate the purposes" of the decree. Thus, if the District Court concluded that the layoffs would frustrate those purposes, then the decree empowered the District Court to enter an appropriate order. Once again,

however, on the limited factual record before the Court, it is improper to speculate about whether the layoffs would have frustrated the gains made under the consent decree sufficiently to justify a permanent injunction.

The Court rejects the argument that the injunctive relief was a proper exercise of the power to enforce the purposes of the decree principally on the ground that the remedy agreed upon in the consent decree did not specifically mention layoffs. *Ante*, at 575. This treatment of the issue is inadequate. The power of the District Court to enter further orders to effectuate the purposes of the decree was a part of the agreed remedy. The parties negotiated for this, and it is the obligation of the courts to give it meaning. In an ideal world, a well-drafted consent decree requiring structural change might succeed in providing explicit directions for all future contingencies. But particularly in civil rights litigation in which implementation of a consent decree often takes years, such foresight is unattainable. Accordingly, parties to a consent decree typically agree to confer upon supervising courts the authority to ensure that the purposes of a decree are not frustrated by unforeseen circumstances. The scope of such authority in an individual case depends principally upon the intent of the parties. Viewed in this light, recourse to such broad notions as the "purposes" of a decree is not a rewriting of the parties' agreement, but rather a part of the attempt to implement the written terms. The District Judge in these cases, who presided over the negotiation of the consent decree, is in a unique position to determine the nature of the parties' original intent, and he has a distinctive familiarity with the circumstances that shaped the decree and defined its purposes. Accordingly, he should be given special deference to interpret the general and any ambiguous terms in the decree. It simply is not a sufficient response to conclude, as the Court does, that the District Court could not enjoin the proposed layoff plan merely because layoffs were not specifically mentioned in the consent decree.

In this regard, it is useful to note the limited nature of the injunctive relief ordered by the District Court. The preliminary injunction did not embody a conclusion that the city could never conduct layoffs in accordance with its seniority policy. Rather, the District Court preliminarily enjoined a particular application of the seniority system as a basis for a particular set of layoffs. Whether the District Court would enjoin a future layoff presumably would depend on the factual circumstances of that situation. Such a future layoff presumably would affect a different proportion of blacks and whites; the black representation in the Fire Department presumably would be higher; the layoffs presumably would negate a smaller portion of the gains made under the decree; and the judge would have worked with the parties at implementing the decree for a longer period of time. There is no way of knowing whether the District Court would conclude that a future layoff conducted on the basis of seniority would frustrate the purposes of the decree sufficiently to justify an injunction. For this reason, the Court is wrong to attach such significance to the fact that the consent decree does not provide for a suspension of the seniority system during all layoffs, for that is not what the District Court ordered in these cases.

B

The Court of Appeals also suggested that respondents could have prevailed on the merits because the 1981 layoffs may have justified a modification of the consent decree. This Court frequently has recognized the inherent "power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent." *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932); accord, *Pasadena City Board of Education* v. *Spangler*, 427 U. S. 424, 437 (1976); *United States* v. *United Shoe Machinery Corp.*, 391 U. S. 244, 251 (1968). "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and

processes on behalf of the party who obtained that equitable relief." *Railway Employees* v. *Wright*, 364 U. S. 642, 647 (1961). The test for ruling on a plaintiff's request for a modification of a consent decree is "whether the change serve[s] to effectuate . . . the basic purpose of the original consent decree." *Chrysler Corp.* v. *United States*, 316 U. S. 556, 562 (1942).

The Court rejects this ground for affirming the preliminary injunction, not by examining the purposes of the *consent decree* and whether the proposed layoffs justified a modification of the decree, but rather by reference to Title VII. The Court concludes that the preliminary injunction was improper because it "imposed on the parties as an adjunct of settlement something that could not have been ordered had the case gone to trial and the plaintiffs proved that a pattern or practice of discrimination existed." *Ante*, at 579. Thus, the Court has chosen to evaluate the propriety of the preliminary injunction by asking what type of relief the District Court could have awarded had respondents litigated their Title VII claim and prevailed on the merits. Although it is far from clear whether that is the right question,[9] it is clear that the Court has given the wrong answer.

---

[9] The Court's analysis seems to be premised on the view that a consent decree cannot provide relief that could not be obtained at trial. In addressing the Court's analysis, I do not mean to imply that I accept its premise as correct. In *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), this Court considered whether an affirmative-action plan adopted voluntarily by an employer violated Title VII because it discriminated against whites. In holding that the plan was lawful, the Court stressed that the voluntariness of the plan informed the nature of its inquiry. *Id.*, at 200; see also *id.*, at 211 (concurring opinion). Because a consent decree is an agreement that is enforceable in court, it has qualities of both voluntariness and compulsion. The Court has explained that Congress intended to encourage voluntary settlement of Title VII suits, *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 88, n. 14 (1981), and cooperative private efforts to eliminate the lingering effects of past discrimination. *Weber*, 443 U. S., at 201–207. It is by no means clear, therefore, that the permissible scope of relief available under a consent decree is the same as could be ordered by a court after a finding of liability at trial.

Had respondents prevailed on their Title VII claims at trial, the remedies available would have been those provided by § 706(g), 42 U. S. C. § 2000e–5(g). Under that section, a court that determines that an employer has violated Title VII may "enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, *but is not limited to*, reinstatement or hiring of employees, with or without back pay . . . , *or any other equitable relief as the court deems appropriate*" (emphasis added). The scope of the relief that could have been entered on behalf of respondents had they prevailed at trial therefore depends on the nature of relief that is "appropriate" in remedying Title VII violations.

In determining the nature of "appropriate" relief under § 706(g), courts have distinguished between individual relief and race-conscious class relief. Although overlooked by the Court, this distinction is highly relevant here. In a Title VII class action of the type brought by respondents, an individual plaintiff is entitled to an award of individual relief only if he can establish that he was the victim of discrimination. That requirement grows out of the general equitable principles of "make whole" relief; an individual who has suffered no injury is not entitled to an individual award. See *Teamsters* v. *United States*, 431 U. S. 324, 347–348, 364–371 (1977). If victimization is shown, however, an individual is entitled to whatever retroactive seniority, backpay, and promotions are consistent with the statute's goal of making the victim whole. *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 762–770 (1976).

In Title VII class actions, the Courts of Appeals are unanimously of the view that race-conscious affirmative relief can also be "appropriate" under § 706(g).[10] See *University of*

---

[10] See *e. g.*, *Boston Chapter, NAACP, Inc.* v. *Beecher*, 504 F. 2d 1017, 1027–1028 (CA1 1974), cert. denied, 421 U. S. 910 (1975); *Rios* v. *Enter-*

*California Regents* v. *Bakke,* 438 U. S. 265, 301–302 (1978) (opinion of POWELL, J.); *id.,* at 353, n. 28 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). The purpose of such relief is not to make whole any particular individual, but rather to remedy the present classwide effects of past discrimination or to prevent similar discrimination in the future. Because the discrimination sought to be alleviated by race-conscious relief is the classwide effects of past discrimination, rather than discrimination against identified members of the class, such relief is provided to the class as a whole rather than to its individual members. The relief may take many forms, but in class actions it frequently involves percentages—such as those contained in the 1980 consent decree between the city and respondents—that require race to be taken into account when an employer hires or promotes employees. The distinguishing feature of race-conscious relief is that no individual member of the disadvantaged class has a claim to it, and individual beneficiaries of the relief need not show that they were themselves victims of the discrimination for which the relief was granted.

In the instant cases, respondents' request for a preliminary injunction did not include a request for individual awards of retroactive seniority—and, contrary to the implication of the Court's opinion, the District Court did not make any such

---

*prise Assn. Steamfitters Local 638,* 501 F. 2d 622, 629 (CA2 1974); *EEOC* v. *American Tel. & Tel. Co.;* 556 F. 2d 167, 174–177 (CA3 1977), cert. denied, 438 U. S. 915 (1978); *Chisholm* v. *United States Postal Service,* 665 F. 2d 482, 499 (CA4 1981); *United States* v. *City of Alexandria,* 614 F. 2d 1358, 1363–1366 (CA5 1980); *United States* v. *I. B. E. W., Local No. 38,* 428 F. 2d 144 (CA6), cert. denied, 400 U. S. 943 (1970); *United States* v. *City of Chicago,* 663 F. 2d 1354 (CA7 1981) (en banc); *Firefighters Institute* v. *City of St. Louis,* 616 F. 2d 350, 364 (CA8 1980), cert. denied, 452 U. S. 938 (1981); *United States* v. *Ironworkers Local 86,* 443 F. 2d 544, 553–554 (CA9), cert. denied, 404 U. S. 984 (1971); *United States* v. *Lee Way Motor Freight, Inc.,* 625 F. 2d 918, 944 (CA10 1979); *Thompson* v. *Sawyer,* 219 U. S. App. D. C. 393, 430, 678 F. 2d 257, 294 (1982).

awards. Rather, the District Court order required the city to conduct its layoffs in a race-conscious manner; specifically, the preliminary injunction prohibited the city from conducting layoffs that would "decrease the percentage of black[s]" in certain job categories. The city remained free to lay off any individual black so long as the percentage of black representation was maintained.

Because these cases arise out of a consent decree, and a trial on the merits has never taken place, it is of course impossible for the Court to know the extent and nature of any past discrimination by the city. For this reason, to the extent that the scope of appropriate relief would depend upon the facts found at trial, it is impossible to determine whether the relief provided by the preliminary injunction would have been appropriate following a trial on the merits. Nevertheless, the Court says that the preliminary injunction was inappropriate because, it concludes, respondents could not have obtained similar relief had their cases been litigated instead of settled by a consent decree.

The Court's conclusion does not follow logically from its own analysis. As the Court points out, the consent decree arose out of a Title VII suit brought by respondents alleging, *inter alia*, that the city had engaged in a pattern and practice of discrimination against members of the plaintiff class. Mr. Stotts, the named plaintiff, claimed that he and the class members that he represented had been denied promotions solely because of race, and that because of that discrimination, he and other members of the class had been denied their rightful rank in the Memphis Fire Department. See Complaint of Respondents in No. 82–229, ¶¶ 9 and 10, App. 10. Had respondents' case actually proceeded to trial, therefore, it would have involved the now familiar two-stage procedure established in *Teamsters* and *Franks*. The first stage would have been a trial to determine whether the city had engaged in unlawful discrimination; if so, the case would proceed to the second stage, during which the individual members of the class would have the opportunity to establish that they were

victims of discrimination. *Teamsters*, 431 U. S., at 371, 375.
The Court itself correctly indicates: "If individual members of
a plaintiff class demonstrate that they have been actual victims
of the discriminatory practice, they may be awarded competi-
tive seniority and given their rightful place on the seniority
roster." *Ante*, at 578–579. Were respondents to prevail at
trial on their claims of discrimination, therefore, they would
have been entitled to individual awards of relief, including
appropriate retroactive seniority. Thus, even treating the
District Court's preliminary injunction as if it granted indi-
vidual awards of retroactive seniority to class members, it
is relief that respondents might have obtained had they gone
to trial instead of settling their claims of discrimination.
Thus, the Court's conclusion is refuted by its own logic and
by the very cases on which it relies to come to its result.[11]

For reasons never explained, the Court's opinion has fo-
cused entirely on what respondents have actually shown, in-
stead of what they might have shown had trial ensued. It is
improper and unfair to fault respondents for failing to show
"that any of the blacks protected from layoff had been a vic-
tim of discrimination," *ante*, at 579, for the simple reason that
the claims on which such a showing would have been made
never went to trial. The whole point of the consent decree in
these cases—and indeed the point of most Title VII consent
decrees—is for both parties to avoid the time and expense of

[11] The Court's opinion is sufficiently ambiguous to suggest another in-
terpretation. The Court concludes that the preliminary injunction was
improper because it gave respondents something they could not have
obtained had they proved that "a pattern or practice of discrimination
existed." *Ante*, at 579. It is possible, therefore, that the Court is sug-
gesting that the limit on relief available under a consent decree is that
which could be awarded if a plaintiff prevailed in "stage I" of a case but
failed to proceed to "stage II" during which the plaintiff seeks to identify
actual victims of discrimination. But the Court has failed to provide any
support for this odd notion. The rationale underlying its opinion seems to
be that the limit of the District Court's remedial power is that which could
have been ordered following a trial on the alleged discrimination, not just
the first stage of such a trial.

litigating the question of liability and identifying the victims of discrimination. In the instant consent decree, the city expressly denied having engaged in any discrimination at all. Nevertheless, the consent decree in these cases provided several persons with both promotions and backpay. By definition, all such relief went to persons never determined to be victims of discrimination, and the Court does not indicate that it means to suggest that the original consent decree in these cases was invalid. Any suggestion that a consent decree can provide relief only if a defendant concedes liability would drastically reduce, of course, the incentives for entering into consent decrees. Such a result would be incongruous, given the Court's past statements that "Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 88, n. 14 (1981); see *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974).

The Court's reliance on *Teamsters* is mistaken at a more general level as well, because *Teamsters* was concerned with individual relief, whereas these cases are concerned exclusively with classwide, race-conscious relief. *Teamsters* arose out of two pattern-or-practice suits filed by the Government alleging that a union and an employer had discriminated against minorities in hiring truckdrivers. Prior to a finding of liability, the Government entered into a consent decree in partial resolution of the suit. In that decree, the defendants agreed to a variety of race-conscious remedial actions, including a requirement that the company hire "one Negro or Spanish-surnamed person for every white person" until a certain percentage of minority representation was achieved. 431 U. S., at 330–331, n. 4. The decree did not settle the claims of individual class members, however, and allowed the individuals whom the court found to be victims of discrimination to seek whatever retroactive seniority was appropriate under Title VII. *Ibid.*

In *Teamsters*, therefore, all classwide claims had been settled before the case reached this Court. The case concerned

only the problems of determining victims and the nature of appropriate individual relief. *Teamsters* did not consider the nature of appropriate affirmative class relief that would have been available had such relief not been provided in the consent decree between the parties. The issue in the present cases, as posed by the Court, is just the reverse. Respondents have not requested individual awards of seniority, and the preliminary injunction made none. Thus, the issue in these cases is the appropriate scope of classwide relief—an issue not present in *Teamsters* when that case came here. *Teamsters* therefore has little relevance for these cases.

The Court seeks to buttress its reliance on *Teamsters* by stressing on the last sentence of § 706(g). That sentence states that a court cannot order the "hiring, reinstatement, or promotion of an individual as an employee . . . if such individual . . . was refused employment or advancement or was suspended or discharged for any reason other than discrimination" in violation of Title VII. The nature of the Court's reliance on that sentence is unclear, however, because the Court states merely that the District Court "ignores" the "policy behind § 706(g)." *Ante*, at 582–583, 579. For several reasons, however, it appears that the Court relies on the policy of § 706(g) only in making a particularized conclusion concerning the relief granted in these cases, rather than a conclusion about the general availability of race-conscious remedies.

In discussing § 706(g), the Court relies on several passages from the legislative history of the Civil Rights Act of 1964 in which individual legislators stated their views that Title VII would not authorize the imposition of remedies based upon race. And while there are indications that many in Congress at the time opposed the use of race-conscious remedies, there is authority that supports a narrower interpretation of § 706(g). Under that interpretation, the last sentence of § 706(g) addresses only the situation in which a plaintiff demonstrates that an employer has engaged in unlawful discrimination, but the employer can show that a particular

individual would not have received the job, promotion, or reinstatement even in the absence of discrimination because there was also a lawful justification for the action. See *Patterson* v. *Greenwood School District 50,* 696 F. 2d 293, 295 (CA4 1982); *EEOC* v. *American Tel. & Tel. Co.*, 556 F. 2d 167, 174–177 (CA3 1977), cert. denied, 438 U. S. 915 (1978); *Day* v. *Mathews*, 174 U. S. App. D. C. 231, 233, 530 F. 2d 1083, 1085 (1976); *King* v. *Laborers Int'l Union, Local No. 818*, 443 F. 2d 273, 278–279 (CA6 1971). See also Brodin, The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective, 82 Colum. L. Rev. 292 (1982). The provision, for example, prevents a court from granting relief where an employment decision is based in part upon race, but where the applicant is unqualified for the job for nondiscriminatory reasons. In that sense, the section merely prevents a court from ordering an employer to hire someone unqualified for the job, and has nothing to do with prospective classwide relief.

Much of the legislative history supports this view. What is now § 706(g) had its origin in § 707(e) of H. R. 7152, 88th Cong., 1st Sess. (1963). That original version prevented a court from granting relief to someone that had been refused employment, denied promotion, or discharged "for cause." The "for cause" provision presumably referred to what an employer must show to establish that a particular individual should not be given relief. That language was amended by replacing "for cause" with "for any reason other than discrimination on account of race, color, religion or national origin," which was the version of the sentence as passed by the House. The author of the original version and the amendment explained that the amendment's only purpose was to specify cause, and to clarify that a court cannot find a violation of the Act that is based upon facts other than unlawful discrimination. 110 Cong. Rec. 2567 (1964) (remarks of Rep. Celler). There is no indication whatever that the amendment was intended to broaden its prohibition to include all forms of prospective race-conscious relief.

In any event, § 706(g) was amended by the Equal Employment Opportunity Act of 1972, 86 Stat. 107. The legislative history of that amendment strongly supports the view that Congress endorsed the remedial use of race under Title VII. The amendment added language to the first sentence of § 706(g) to make clear the breadth of the remedial authority of the courts. As amended, the first sentence authorizes a court to order "such affirmative action as may be appropriate, which may include, *but is not limited to,* reinstatement or hiring of employees, with or without back pay . . . *or any other equitable relief as the court deems appropriate.*" 42 U. S. C. § 2000e–5(g) (emphasized language added in 1972).

In addition, during consideration of the amendment, Congress specifically rejected an attempt to amend Title VII to *prohibit* the use of prospective race-conscious employment goals to remedy discrimination. Senator Ervin proposed an amendment to Title VII intended to prohibit Government agencies from requiring employers to adopt goals or quotas for the hiring of minorities. 118 Cong. Rec. 1663–1664 (1972). Senator Javits led the debate against the amendment. *Id.*, at 1664–1676. Significantly, Senator Javits stressed that the amendment would affect not only the activities of federal agencies, but also the scope of judicial remedies available under Title VII. He referred repeatedly to court decisions ordering race-conscious remedies, and asked that two such decisions be printed in the Congressional Record. *Id.*, at 1665–1675.[12] He stated explicitly his view

---

[12] The two cases placed in the Congressional Record were *United States* v. *Ironworkers Local 86,* 443 F. 2d 544 (CA9) (a percentage goal for black participation in apprenticeship program as part of remedy for Title VII violation), cert. denied, 404 U. S. 984 (1971), and *Contractors Association of Eastern Pennsylvania* v. *Secretary of Labor,* 442 F. 2d 159 (CA3) (upheld lawfulness of a plan requiring contractors on federally assisted projects to adopt goals for minority employment), cert. denied, 404 U. S. 854 (1971). Senator Javits also noted the Justice Department's practice of seeking consent decrees in Title VII cases containing percentage hiring goals. 118 Cong. Rec. 1675 (1972).

that "[w]hat this amendment seeks to do is to undo . . . those court decisions." *Id.*, at 1665. The amendment was rejected by a 2-to-1 margin. *Id.*, at 1676.

With clear knowledge, therefore, of courts' use of race-conscious remedies to correct patterns of discrimination, the 1972 Congress rejected an attempt to amend Title VII to prohibit such remedies. In fact, the Conference Committee stated: "In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII." 118 Cong. Rec. 7166 (1972). Relying on this legislative history of the 1972 amendment and other actions by the Executive and the courts, four Members of this Court, including the author of today's opinion, stated in *University of California Regents* v. *Bakke*, 438 U. S. 265, 353, n. 28 (1978): "Executive, judicial, and congressional action subsequent to the passage of Title VII conclusively established that the Title did not bar the remedial use of race" (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). As has been observed, n. 10, *supra*, moreover, the Courts of Appeals are unanimously of the view that race-conscious remedies are not prohibited by Title VII. Because the Court's opinion does not even acknowledge this consensus, it seems clear that the Court's conclusion that the District Court "ignored the policy" of § 706(g) is a statement that the race-conscious relief ordered in these cases was broader than necessary, not that race-conscious relief is never appropriate under Title VII.

## IV

By dissenting, I do not mean glibly to suggest that the District Court's preliminary injunction necessarily was correct. Because it seems that the affected whites have no contractual rights that were breached by the city's modified layoff plan, the effect of the preliminary injunction was to shift the pain of the city's fiscal crisis onto innocent employees. This

Court has recognized before the difficulty of reconciling competing claims of innocent employees who themselves are neither the perpetrators of discrimination nor the victims of it. "In devising and implementing remedies under Title VII, no less than in formulating any equitable decree, a court must draw on the 'qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *Teamsters*, 431 U. S., at 375, quoting *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330 (1944). If the District Court's preliminary injunction was proper, it was because it correctly interpreted the original intent of the parties to the consent decree, and equitably enforced that intent in what admittedly was a zero-sum situation. If it was wrong, it was because it improperly interpreted the consent decree, or because a less painful way of reconciling the competing equities was within the court's power. In either case, the District Court's preliminary injunction terminated many months ago, and I regret the Court's insistence upon unnecessarily reviving a past controversy.