RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA, et al.,

*Plaintiffs*,

*v.*

BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO,

*Defendant-Appellee*,

CITY OF CINCINNATI,

*Defendant-Appellant*.

No. 18-4036

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:02-cv-00107—Michael R. Barrett, District Judge.

Argued: August 6, 2019

Decided and Filed: September 6, 2019

Before: ROGERS, BUSH, and LARSEN, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Aaron M. Herzig, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Anthony L. Osterlund, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Aaron M. Herzig, Donnell J. Bell, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Anthony L. Osterlund, Mark A. Norman, Nathan L. Colvin, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, James W. Harper, Charles W. Anness, Michael Friedmann, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellee.

---

**OPINION**

---

ROGERS, Circuit Judge.  In 1968, the Board of County Commissioners of Hamilton County, Ohio and the City of Cincinnati consolidated their sewer districts into a single sewer system and entered an agreement providing that the City would manage the sewer system's operations, subject to County oversight, for a period of fifty years.  After the City indicated that it planned to unilaterally withdraw from the agreement in 2018, the Board sought intervention from the district court.  The court found that the City's withdrawal would interfere with environmental remediation projects that the City and Board had committed to implement under a 2004 consent decree.  To prevent this from happening, the court temporarily extended the term of the 1968 agreement, enjoining the City's withdrawal pursuant to the court's inherent power to enforce consent decrees.  The district court did not abuse its discretion in granting the temporary injunction because doing so was necessary to enforce the terms and objectives of the 2004 consent decree.

**I.**

**A.**

The Board of County Commissioners of Hamilton County established and operated sewer districts in accordance with Ohio law beginning in 1924, and a few decades later it consolidated the sewer districts into a single county sewer district called "Hamilton County Sewer District No. 1."  By 1968 the Board's management of the consolidated sewer district had attracted criticism due to mounting problems with pollution in Hamilton County.  To resolve these problems, the Board turned to the City of Cincinnati, which had managed its own sewer system for over 150 years.

The City assisted the Board in two ways.  First, the City passed an ordinance authorizing the consolidation of its sewer system with Hamilton County Sewer District No. 1.  The ordinance provided that "in becoming a part of Hamilton County Sewer District No. 1, [the City] Council conveys to the Board of County Commissioners, for use only, all of the sanitary sewage

facilities" that were "owned and operated by the City of Cincinnati for the sole and exclusive use of the sewer district." The reason for the ordinance was "the necessity of providing for the creation of one combined sewer district for the City and County under the direction and control of the County Commissioners," and the City "authorize[d] and consent[ed] to the construction, maintenance, repair and operation of any sewer improvement for local service" within the City by the Board. The Board approved the consolidation of the City's sewer system with Hamilton County Sewer District No. 1 through a resolution, with the new consolidated sewer district being named "The Metropolitan Sewer District of Greater Cincinnati" ("MSD"). Neither the City's ordinance nor the Board's resolution contained provisions about when, if ever, the sewer district was to be de-consolidated.

Second, the Board and the City entered into a written agreement (the "1968 Agreement") that established what the district court would later characterize as a principal-agent relationship between the two respective parties. The City, assuming the role of an agent, was to "provide a total and complete management service for the operation of the county sewer system." To fulfill its responsibility of doing "all things necessary to manage and operate the [MSD] in an efficient and businesslike manner," the City agreed, among other things, to "[m]aintain and operate all sanitary and combined sewers, sewage pumping stations and sewer treatment facilities," and to "draft all necessary legislation" for the sewage system and submit such legislation to the Board "for consideration and approval." The City also agreed to employ MSD staff, including those who transferred to the City from the County. Such transferees were "completely subject to the City's personnel Rules and Regulations" after the transfer was completed, though they had the option of participating in the retirement system of either the City or the State.

The Board, assuming the role of a principal, was granted the authority to oversee the City's management of the sewer system, with the 1968 Agreement providing that the City's management was "subject to the exclusive control and direction of the [Board of] Commissioners." Similarly, a different provision of the 1968 Agreement stipulated that "authority and control of the sewer system of the sewer district shall remain vested in the [Board of] Commissioners including, but not limited to, the major responsibilities of fixing sewerage service charges, adopting Rules and Regulations and approving capital improvement programs,

and undertaking the necessary legislation therefor." The arrangement was to "be in full force and effect for a fifty (50) year period beginning May 1, 1968, and thereafter extended for additional periods of time as are mutually agreed upon by the County and the City." During that time period, the 1968 Agreement provided that "the City will be the sole management and operating agency for the sewer system of the district."

**B.**

In 2002, the United States Environmental Protection Agency ("EPA"), the State of Ohio, and the Ohio River Valley Water Sanitation Commission ("Sanitation Commission") sued the Board and the City, alleging that the codefendants' management of MSD had violated the Clean Water Act, along with similar Ohio laws and regulations. According to the Amended Complaint, the codefendants had allowed MSD's discharge of certain pollutants to exceed authorized limits, had discharged other pollutants from MSD's sewage system without obtaining permits to do so, and had failed to prevent the release of sewage overflows into buildings. The plaintiffs sought, among other things, injunctive relief and civil penalties for the various alleged infractions.

The parties resolved the dispute in 2004 by entering into two consent decrees—one interim decree and one final decree (collectively, the "Consent Decree"). The parties' "express purpose" in entering into the Consent Decree was "to further the objectives set forth in Section 101 of the [Clean Water] Act, 33 U.S.C. § 1251, and to resolve the claims of the Plaintiffs for injunctive relief and civil penalties for the violations alleged in [the Amended Complaint] in the manner set forth in" a later section of the Consent Decree. To effectuate these objectives, the Board and the City agreed:

> to use sound engineering practices, consistent with industry standards, to perform investigations, evaluations and analyses and to design and construct any remedial measures required by this Decree; to use sound management, operational, and maintenance practices, consistent with industry standards, to implement all the requirements of this Consent Decree; and to achieve expeditious implementation of the provisions of this Decree with the goals of eliminating all Sanitary Sewer Overflows and Unpermitted Overflows and coming into and remaining in full compliance with the requirements of the Clean Water Act, U.S. EPA's 1994 Combined Sewer Overflow (CSO) Policy, Chapter 6111 of the Ohio Revised Code and the rules promulgated thereunder, the Compact and the pollution control standards promulgated thereunder, and Defendants' Current Permits.

The Consent Decree required the Board and the City to take measures to remedy the pollution and sewage overflow problems in MSD by particular dates and to pay civil penalties if they missed the deadlines. The codefendants' environmental reform efforts were to be conducted in two phases. The first phase was to be completed by December 31, 2018 at an estimated cost of $1.145 billion, while the second phase was scheduled to begin on January 1, 2019 at an estimated cost of $2.145 billion. In the Consent Decree, the district court retained jurisdiction to "enforce the terms and conditions and achieve the objectives of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation, or execution of this Decree." The Consent Decree also granted the district court jurisdiction to resolve disputes related to the implementation of the Consent Decree:

> This Court shall retain jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and for the purpose of adjudicating all disputes among the Parties (including [the Sanitation Commission]) that may arise under the provisions of this Consent Decree . . . . [including] any dispute that arises with respect to the meaning, application, implementation, interpretation, amendment or modification of this Consent Decree, or with respect to Defendants' compliance herewith . . . or any delay hereunder, the resolution of which is not expressly provided for in this Consent Decree.

The Consent Decree stipulated that its provisions were "binding upon the Defendants," and a sale or transfer of either defendant's interest in the sewer system would not alter that fact:

> Effective from the Date of Lodging of this Consent Decree until its termination, any sale or transfer of either Defendant['s] interests in or operating role with respect to the Sewer System or WWTPs [wastewater treatment plants] shall not in any manner relieve either Defendant of its responsibilities for meeting the terms and conditions of this Consent Decree, except as provided in Paragraph III.C.

Paragraph III.C's exception applied if either defendant sought to name a successor in interest to assume its responsibilities under the Consent Decree and succeeded in obtaining permission from the parties or the district court to amend the Consent Decree to effectuate the change:

> If either Defendant seeks to name a successor in interest to assume any or all of its interest in, or operating role with respect to, the Sewer System or WWTPs, such defendant may request modification of this Consent Decree from

U.S. EPA/Ohio EPA/[Sanitation Commission] to amend this Consent Decree in accordance with the role to be assumed by the proposed successor in interest. Upon such Defendant's request, the Parties shall discuss the matter. If the Parties agree on a proposed modification to the Consent Decree, they shall prepare a joint motion to the Court requesting such modification and seeking leave to join the proposed successor in interest. If the Parties do not agree, and the Defendant still believes modification of this Decree and joinder of a successor in interest is appropriate, it may file a motion seeking such modification in accordance with Federal Rule of Civil Procedure 60(b); provided, however, that nothing in this Paragraph is intended to waive the Plaintiffs' right to oppose such motion and to argue that such modification is unwarranted.

The Consent Decree's description of the relationship between the Board and the City was consistent with the 1968 Agreement, as multiple Consent Decree provisions recognized the principal-agent relationship that the Board and City established. For example, the Consent Decree described the Board as

the duly authorized governing body of Hamilton County, Ohio, pursuant to the laws of the State of Ohio. The County is the holder of various NPDES permits that govern discharges from the County's Wastewater Treatment Plants and Sewer System. As such, it is responsible for operating the County's Wastewater Treatment Plants and Sewer System. The County has established the MSD, a county sewer district established pursuant to Chapter 6117 of the Ohio Revised Code, and acts as the principal of MSD, including maintenance of funding authority for MSD.

A different Consent Decree provision characterized the City as the Board's agent:

Defendant, City of Cincinnati ("the City"), is a chartered municipal corporation, organized and existing under the laws of the State of Ohio. Pursuant to an agreement with the County, and subject to the pertinent provisions of the Ohio Revised Code, the City also serves as the agent for the County in the management and operation of MSD. It is in this capacity that the City is named as Defendant.

**C.**

The implementation of the Consent Decree has not gone smoothly. Consent Decree projects have been set back by delays and budgetary shortfalls, and the Board and the City have blamed each other for the problems. By 2013, City officials were becoming increasingly frustrated with the County's attempts to implement new oversight measures, because the oversight allegedly interfered with the City's management of MSD. The oversight measures

included "requests for reports, records, justifications, and financial information," along with the use of County "monitors" (consisting of "new County employees, consultants, and lawyers") to evaluate the City's work. Meanwhile, County officials were opposed to the City's decision to pass three procurement ordinances that were intended to apply to contract bids for Consent Decree projects. The first ordinance required contractors to ensure that a certain percentage of construction worker hours were performed by Hamilton County residents, the second required some contractors to employ a certain percentage of apprentices in their workforces, and the third gave a bidding advantage to small businesses from the City.

The County did not approve of the City's procurement policies, as County officials believed that MSD should be governed by State and County law. When the City refused to back down and comply with the County's position, the County responded by passing a series of resolutions. The first resolution suspended appropriations for MSD projects pending resolution of the procurement dispute. The second resolution terminated the suspension and authorized MSD contract bidding to proceed under State law, providing that any project bid "awarded contrary to this authorization" would be "de-legislated effective immediately." The County followed through on this threat in a subsequent resolution, which de-legislated MSD projects that had "violated the County's policies" by being subject to the City's procurement ordinances.

The City and the Board continued to discuss their procurement policies and exchange memos on the issue in 2013 and 2014, but their efforts to resolve the dispute proved futile. As a result, the Board sought intervention from the district court, filing a motion to enjoin the City from violating the Consent Decree. The Board argued that the 1968 Agreement established a principal-agent relationship between the Board and the City, and that the City was accordingly required to follow the laws and regulations of the State and County while operating MSD. Because the City's procurement ordinances allegedly conflicted with Ohio law, the Board requested that the court issue an injunction "pursuant to the Consent Decree, the All Writs Act, and the Court's inherent powers and prior orders." The City countered that the Board's motion amounted to a request for the court "to rewrite the 1968 Agreement," because the City and Board had "agreed that the City's sole management of [MSD] meant that the City would follow the laws and requirements which pertain to Cincinnati as a municipal corporation in contracts and

purchases for the MSD." According to the City, the 1968 Agreement put the City in charge of MSD's operations, and MSD should be subject to City ordinances rather than the laws and regulations of the State and the County.

The district court granted the Board's motion. The court determined that the 1968 Agreement established a principal-agent relationship between the Board and the City, citing multiple provisions from the 1968 Agreement providing that the City's management authority was subject to County oversight. The court reasoned that because the Board acts as MSD's principal, the City was bound to apply the laws of the State and County in its operation of MSD, rather than City ordinances: "The City's authority to operate and manage MSD is not unqualified but is restricted by the 1968 Agreement and state law which require the City—as the agent for the County—to apply County rules and regulations and state law in procuring contracts for Consent Decree projects." The court concluded that "the plain terms of the 1968 Agreement" indicated that "the City must adhere to the County's rules and regulations, as well as the County's resolutions, for procuring Consent Decree projects." The City did not appeal the district court's order.

**D.**

The order did not resolve the parties' disputes over procurement policies and other Consent Decree issues. In 2016, the Board filed a second motion to enjoin the City's alleged violations of the Consent Decree, characterizing the City as a "rogue agent" that was "opposing County oversight and directives and MSD Rules" and subjecting taxpayers to "soaring" costs in the process. The Board also moved for the court "to order the County and City to mediation to address the impending termination" of the 1968 Agreement. In its Response, the City opposed the Board's request for an injunction, arguing that such an injunction would "nullify the 1968 Agreement by permitting the County to take managerial and operational control of [MSD] and the City's sewer assets." However, on the issue of mediation, the City agreed to participate in "Court-led negotiations designed to help ensure that termination of the 1968 Agreement proceeds in an orderly manner."

The Board and the City began mediation, which culminated in their agreement to a "MSD Operation Transition and Cooperation Agreement Commitment Letter" ("Commitment Letter") in 2017. The Commitment Letter provided a preliminary plan for the termination of the 1968 Agreement and the transfer of MSD operations to the Board. Two conditions precedent needed to be satisfied before a final termination plan would go into effect: (1) the City was to be "removed as a defendant" in the MSD case and was to "not remain or act to become a party," a condition that required court approval "under the terms of the Consent Decrees in the MSD case"; and (2) "[a]ll present and future Sewer District employees" were to become "County [Board] employees" and "Members of the Cincinnati Retirement System," an arrangement that required a change in state law. If the parties were unable to approve a final termination plan prior to the expiration of the 1968 Agreement, the Commitment Letter provided for an extension of the 1968 Agreement through September 30, 2018. The Commitment Letter also granted the district court "continuing jurisdiction" over the Commitment Letter and the eventual termination agreement.

**E.**

In July of 2018 the parties realized that "the conditions precedent identified in the Commitment Letter could not be completed by the time the [1968 Agreement] was set to expire, September 30, 2018." After a series of exchanges, the Board and the City remained deadlocked on how to proceed. The County proposed that they unconditionally extend the 1968 Agreement to July 1, 2019 and use the remaining time to continue mediation. The City refused. Instead, the City promised to continue to manage the sewer system, provided that the County agreed to implement multiple recommendations made by a consulting firm, Roetzel & Andress LPA, that the City and County had hired to evaluate MSD's operations. The recommendations included that the County end its monitor program, that the County "[r]epeal redundant and overly burdensome administrative rules and regulations," and that the County agree to follow the City's approach for the second phase of the Consent Decree. If the Board refused to acquiesce to the City's proposal, a City memo suggested that the City planned to unilaterally withdraw from the 1968 Agreement:

The Agreement becomes effective only when the conditions precedent are met. If they are not met by September 30, 2018, the 1968 Agreement expires. At that point, the City returns to operating the City sewer system as it did before the 1968 Agreement was signed. The [Board] could negotiate with the City for the City to continue operating the County system as well.

In light of this impasse, the Board filed a third motion to enjoin the City from violating the Consent Decree. The Board requested that the district court act "pursuant to the Court's inherent injunctive power and the All Writs Act, 28 U.S.C. § 1651(a), or, alternatively, to Fed. R. Civ. P. 65" by issuing an order: (1) to enjoin the City from withdrawing or deconsolidating from MSD; (2) to enjoin the City "from attempting to assert control over, or otherwise interfere with MSD assets"; (3) to grant a temporary extension of the 1968 Agreement; and (4) to require the City to "adhere to the law of the case established by multiple Court orders." In support of its Motion, the Board emphasized that the City's unilateral withdrawal from MSD would prevent the parties from managing the sewer system and complying with their Consent Decree commitments. According to the Board, "the City would irreparably harm implementation of this Court's Consent Decree, the County, and MSD ratepayers, if it refuses to temporarily unconditionally extend the [1968 Agreement]." In its Response, the City contended that the district court should deny the Board's requested injunction and instead order the County to comply with the consulting firm's recommendations, in which case the City would continue to "manage and operate the entire sewer system and meet Consent Decree obligations."

The district court granted the Board's motion in part and denied it in part. Relying on the "inherent power to enforce its consent decrees," the court "temporarily extend[ed] the [1968 Agreement] until further order of this Court." In support of its decision, the court determined that the City's proposal to "return to a pre-1968 arrangement where the County and the City manage their own sewer systems is not workable and threatens the successful completion of the objectives of the Consent Decree." It also ordered the County and the City "to continue mediation efforts, which shall include addressing the City's concerns regarding the County's monitoring program; certain County rules and regulations which the City has identified as unworkable and inefficient; and reaching consensus with regard to the projects planned for Phase II of the Consent Decree."

**II.**

The district court did not abuse its discretion in temporarily enjoining the City from withdrawing from the 1968 Agreement by the termination date.  The court possessed the inherent power to enforce consent decrees, and the temporary injunction was a proper exercise of that power in two respects.

**A.**

First, the temporary injunction was necessary to enforce provisions in the Consent Decree providing that the Consent Decree would remain binding on the City and the Board, unless either party named a successor in interest and obtained approval from the other Consent Decree parties or from the district court to permit the successor in interest to take over the party's responsibilities (the "successor-in-interest provision"):

> If either Defendant seeks to name a successor in interest to assume any or all of its interest in, or operating role with respect to, the Sewer System or WWTPs [wastewater treatment plants], such defendant may request modification of this Consent Decree from U.S. EPA/Ohio EPA/[Sanitation Commission] to amend this Consent Decree in accordance with the role to be assumed by the proposed successor in interest.  Upon such Defendant's request, the Parties shall discuss the matter.  If the Parties agree on a proposed modification to the Consent Decree, they shall prepare a joint motion to the Court requesting such modification and seeking leave to join the proposed successor in interest.  If the Parties do not agree, and the Defendant still believes modification of this Decree and joinder of a successor in interest is appropriate, it may file a motion seeking such modification in accordance with Federal Rule of Civil Procedure 60(b); provided, however, that nothing in this Paragraph is intended to waive the Plaintiffs' right to oppose such motion and to argue that such modification is unwarranted.

Absent a modification of the Consent Decree pursuant to this provision, the Consent Decree provided no way for either the City or the County to terminate its responsibilities.  Instead, the Consent Decree was "binding upon" both the City and the County, and a "sale or transfer of either [the City's or the County's] interests in or operating role with respect to" MSD would not automatically terminate that Defendant's obligations.

The City's unilateral withdrawal from the 1968 Agreement with no succession plan would likely have resulted in violations of the Consent Decree.  The Consent Decree explicitly

recognized that the parties' operation of MSD was subject to a principal-agent relationship, as set forth in the 1968 Agreement. For example, one provision of the Consent Decree referred to the County as the "principal of MSD," while another stipulated that the City "serves as the agent for the County in the management and operation of MSD" under "an agreement with the County" and was named as a defendant in that capacity. The City's planned withdrawal from the 1968 Agreement would have terminated the principal-agent relationship between the Board and the City and thus altered the parties' respective roles in the operation of MSD. To ensure that its withdrawal complied with the Consent Decree, which assumed the existence of the principal-agent relationship, the City would have needed to follow the requirements laid out in the Consent Decree's successor-in-interest provision. But the City did not attempt to do so. Instead, when the parties were unable to agree on a final termination plan, the City claimed that the imminent expiration of the 1968 Agreement meant that the City would return "to operating the City sewer system as it did before the 1968 Agreement was signed."

In light of the City's refusal to follow the Consent Decree's protocol for transferring the City's operating role with respect to MSD, the district court properly enjoined the City from withdrawing from the 1968 Agreement. As the district court determined, the City's position "ignores the City's obligations under the Consent Decree" and would have resulted in an arrangement that was "not workable." To prevent this from happening, the court "temporarily extend[ed]" the 1968 Agreement "until further order" of the district court, and its decision to do so was a proper exercise of its inherent power to enforce consent decrees. "[A] consent decree is a 'settlement agreement subject to continued judicial policing.'" *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "[I]t is well-settled that 'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.'" *Id.* at 1018 (quoting *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 917 (6th Cir. 1979)). We have emphasized that the district court's inherent power is "broad," and "[t]he court's choice of remedies is reviewed for an abuse of discretion." *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) (quoting *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 861 (9th Cir. 1992)). The district court did not abuse that discretion here, given that issuing an injunction was necessary to prevent the City from violating the Consent Decree.

This is especially true given the temporary nature of the injunction. Notwithstanding the City's claims to the contrary, both the plain language of the injunction and the record below illustrate that the injunction is temporary. With respect to the district court's language, the order stipulates that the "Court temporarily extends" the 1968 Agreement "until further order of this Court." This is consistent with the district court's description of the injunction as amounting to a way of effecting a "transition period of some kind." It is also consistent with the County's injunction request, which was for the district court to temporarily enjoin the termination of the 1968 Agreement for a period of less than a year while the parties continued mediation.

Although the City offered to continue managing MSD while negotiations continued after the termination of the 1968 Agreement, that does not weigh against the district court's decision to issue the temporary injunction instead of requiring the parties to follow the terms of the City's offer. The City's offer was contingent on the Board's agreeing to reduce its oversight of the City's MSD management and to repeal a number of rules and regulations that the City found to be burdensome. If the measures had been implemented, then they would have conflicted with provisions in the Consent Decree specifying that the Board amounted to the "principal of MSD," while the City acted as the Board's agent. The measures would have also conflicted with the district court's prior order determining that the 1968 Agreement established a principal-agent relationship, according to which the City's management of MSD was subject to State and County laws and regulations. For these reasons, the district court did not abuse its discretion when it declined to permit the City to manage MSD under the terms of the offer.

The court's temporary injunction is distinguishable from a consent decree modification that the Supreme Court vacated in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984), and *Stotts* does not provide a basis for reversing the temporary injunction here. *Stotts* involved consent decrees entered into by the Memphis Fire Department in 1974 and 1980 to resolve allegations of racially discriminatory hiring and promotion practices. 467 U.S. at 565–66. After the entry of the 1980 consent decree, projected budget deficits required the city of Memphis to reduce nonessential government personnel, and Memphis attempted to do so by implementing a layoff rule that favored the retention of senior employees. *Id.* at 566. The district court enjoined the layoff plan and ordered Memphis instead to comply with a modified

layoff plan that was "aimed at protecting black employees" who would have been disproportionately terminated if the seniority system remained in place. *Id.* at 567. The Supreme Court determined that the district court exceeded its inherent power to enforce the consent decree by entering the injunction, in part because the consent decree did not contain any textual provisions indicating that the parties intended to "depart from the existing seniority system." *Id.* at 574.

The Court's analysis rested on multiple factors that distinguish *Stotts* from this case. First, the Court determined that the *Stotts* injunction was inconsistent with the 1980 consent decree that it was purportedly designed to enforce, given that the 1980 consent decree "stated that it was not 'intended to conflict with any provisions' of the 1974 [consent] decree" and that "the latter decree expressly anticipated that the City would recognize seniority." *Id.* Here, the temporary injunction is consistent with the terms of the Consent Decree, including the successor-in-interest provision. Second, the terms of the *Stotts* injunction conflicted with a federal anti-discrimination statute, Title VII, making it reasonable to presume that the parties would not have agreed to such an injunction absent an express provision in the consent decree stipulating otherwise. *Id.* at 575. The temporary injunction in this case presents no such conflict with federal law. Third, the *Stotts* injunction interfered with the rights of nonminority employees and a local union, despite the fact that neither of those groups was a party to the litigation that culminated in the 1980 consent decree. *Id.* at 575–76. In contrast, the court's temporary injunction in this case does not interfere with the rights of third parties. For these reasons, the Court's rejection of the district court's injunction in *Stotts* does not compel a similar result here.

Although the parties anticipated the termination of the 1968 Agreement, that does not undermine the appropriateness of the temporary injunction. The City cites two cases purportedly establishing that a district court exceeds its power when it extends an agreement that "every party knew was set to expire." However, both of the cited cases are distinguishable from this one because they involved motions for modification of a consent decree, raising questions about the extent of the district court's inherent power to make modifications. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 371–72 (1992); *Vanguards of Cleveland*, 23 F.3d at 1017–18. "Modification of a consent decree is appropriate" when one of three circumstances applies:

(1) "changed factual conditions make compliance with the decree substantially more onerous"; (2) "a decree proves to be unworkable because of unforeseen obstacles"; or (3) "enforcement of the decree without modification would be detrimental to the public interest." *Vanguards of Cleveland*, 23 F.3d at 1018 (quoting *Rufo*, 502 U.S. at 384–85). Conversely, "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. The modification rules are inapplicable to this case because the temporary injunction did not modify the Consent Decree.

For these reasons, the district court did not abuse its discretion by entering the temporary injunction, given that doing so was necessary to ensure that the City did not violate the Consent Decree by ceasing to perform its responsibilities without selecting a successor in interest.

**B.**

The second reason that the district court acted within its discretion to issue the temporary injunction was because of its finding, which was not clearly erroneous, that the City's withdrawal from the 1968 Agreement would interfere with the parties' fulfillment of their Consent Decree obligations. The court did not abuse its discretion in temporarily enjoining the City's attempt to withdraw as a way of ensuring that the Consent Decree projects would continue on schedule.

There is sufficient information in the record to support the district court's finding that the City's proposal to withdraw from the 1968 Agreement "threatens the successful completion of the objectives of the Consent Decree." For example, an affidavit from a County official attests to the Board's inability to manage MSD without the City's assistance. Among other problems, the County lacked the employees that would be required to operate MSD when the district court entered the temporary injunction. A County attorney also told the district court that the City's withdrawal would "jeopardize MSD bond debt and credit," and the City did not challenge that statement before the district court or on appeal. When we review a temporary injunction, "[t]he ultimate decision to grant an injunction is reviewed for an abuse of discretion," while the court's "findings of fact are reviewed for clear error." *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). The district court did not clearly

err when it found that the City's withdrawal from the 1968 Agreement would interfere with the timely completion of Consent Decree objectives, and the court did not abuse its discretion by preventing that problem through the entry of the temporary injunction.

This determination is supported by our affirmance of an injunction in a related MSD case. In *United States v. City of Loveland*, 621 F.3d 465 (6th Cir. 2010), the district court entered a judgment on the pleadings that enjoined the City of Loveland from withdrawing from MSD. *Id.* at 467–70. We affirmed the injunction, in part because Loveland was equitably estopped from arguing for withdrawal due to the fact that the Board and City had relied on Loveland's willingness to participate "as they crafted the complex, multiyear infrastructure improvements that have begun the implementation of the remedies required by the Consent Decrees." *Id.* at 474 (quoting *United States v. Bd. of Cty. Comm'rs of Hamilton Cty.*, Nos. 1:02-CV-00107, 1:09-CV-00029, 2010 WL 200326, at *5 (S.D. Ohio Jan. 14, 2010)). *Loveland* supports the district court's temporary injunction in light of the consistency between the Sixth Circuit's affirmance of the finding that Loveland's withdrawal from MSD would interfere with the implementation of the Consent Decree, and the district court's finding in this case that the City's withdrawal from the 1968 Agreement would similarly interfere with the parties' fulfillment of their Consent Decree obligations.

The temporary injunction did not exceed the district court's authority, despite the existence of the contractual provision in the 1968 Agreement providing that the 1968 Agreement was to "be in full force and effect for a fifty (50) year period beginning May 1, 1968, and thereafter extended for additional periods of time as are mutually agreed upon by the County and the City" (the "termination provision"). District courts possess broad authority to enforce the terms of consent decrees, even where doing so requires interfering with municipal prerogatives or commitments. For example, in *Sarabia*, we held that "it was within the power of the district court to suspend a civil service rule whose application prevented achievement of the stated goal of the consent decree." 601 F.2d at 918. Executing their authority to enforce consent decrees, district courts may also limit a municipality's contracting power where necessary. The Third Circuit came to this conclusion when it affirmed a district court's injunction preventing the Government of the Virgin Islands from performing a contract because the court determined that

implementing the contract would interfere with the party's ability to fulfill its obligations under a consent decree. *United States v. Virgin Islands*, 363 F.3d 276, 280, 289 (3d Cir. 2004). The City does not cite cases supporting the contrary position that a district court lacks the power to abrogate contractual provisions that interfere with the enforcement of a consent decree.

Accordingly, the district court did not exceed its inherent power by abrogating the termination provision of the 1968 Agreement and entering the temporary injunction, given the court's determination that the abrogation was necessary to effectuate the parties' obligations to implement environmental reform projects under the Consent Decree.

Because the temporary injunction was a proper exercise of the district court's inherent power to enforce consent decrees, we need not address whether the court had the authority to issue the temporary injunction under the All Writs Act or Federal Rule of Civil Procedure 65.

**III.**

The temporary injunction is affirmed.